UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

QUINTIN J. MAYWEATHER-BROWN,

Plaintiff,

v.                                          CAUSE NO.: 3:14-CV-2089-JD-MGG

STEFFANY BIGLER, et al.,

Defendants.

## OPINION AND ORDER

Quintin J. Mayweather-Brown, a prisoner without a lawyer, is proceeding

against Lieutenant Steffany Bigler, Captain John Perry, and Gary Yoder for failing to

provide him with appropriate conditions of confinement, including adequate clothing,

bedding, and heat while housed at the Elkhart County Jail ("Elkhart Jail") in violation of

the Fourteenth Amendment. (ECF 32; 143.) He is also proceeding against Lieutenant

Bigler, Captain Perry, Dr. Josh Mathew, Robbin Yohn, and Mr. Yoder for failing to

provide him with constitutionally adequate medical care while housed at the Elkhart

Jail in violation of the Fourteenth Amendment. (*Id.*) On October 15, 2018, Mayweather-

Brown filed a motion for summary judgment asserting he is entitled to judgment as a

matter of law on his claims. (ECF 200.) On December 4, 2018, the Defendants responded

by filing cross-motions for summary judgment (ECF 210; 213) asserting there are no

genuine issues of material fact to support Mayweather-Brown's claims. The cross-

motions for summary judgment were accompanied by notices informing Mayweather-

Brown of the motions as required by N.D. Ind. L.R. 56-1(f). (ECF 215; 216.) On February

19, 2019, Mayweather-Brown filed a reply (ECF 231, 232-1) and, on April 15, 2019, he filed a sur-reply. (ECF 258.) On August 2, 2019, Dr. Mathew, Yohn, and Yoder filed a response to Mayweather-Brown's sur-reply. (ECF 286.)

FACTS[1]

Mayweather-Brown was a pretrial detainee at the Elkhart Jail from March 20, 2014 to June 6, 2014, when he was transferred to the Indiana Department of Correction ("IDOC"). (ECF 212-2 at ¶ 5, 212-2 at 6-8, 42-55, 212-4 at 27:15-20.) He returned to the Elkhart Jail on May 22, 2015 and remained there until January 21, 2016, when he was again transferred to the IDOC. (*Id.*)

Mayweather-Brown has sued Lieutenant Bigler, Captain Perry, Dr. Mathew, Mr. Yoder and Ms. Yohn. Bigler was employed by the Elkhart County Sheriff's Department ("Sheriff's Department") as a Sergeant and Lieutenant in the Corrections Division from August 2003 through October 2015. (ECF 212-1 at ¶¶ 2, 3.) Perry was employed by the Sheriff's Department as the Captain of the Corrections Division throughout the time period relevant to this case. (ECF 212-2 at ¶¶ 2, 3.)

Dr. Mathew is a psychiatrist who works for Correct Care Solutions ("CCS"), a private company that contracted with the Sheriff's Department to provide healthcare to inmates at the Elkhart Jail. (ECF 212-5 at ¶ 3.) He is responsible for providing mental health services by diagnosing inmates who have behavioral and psychiatric disorders, prescribing and managing psychiatric medication for inmates, and seeing inmates as

---

[1] The facts are largely uncontested, and the court has borrowed heavily from the Defendants' Statement of Material Facts. (ECF 212.)

needed for acute psychiatric issues. (*Id*. at ¶ 4.) Dr. Mathew creates treatment plans for inmates and advises mental health staff on how best to treat inmates; however, he does not take an active role in monitoring the day-to-day mental healthcare of inmates. (*Id*.)

Yoder is a licensed clinical social worker and was employed by CCS at the Elkhart Jail during the relevant period. (ECF 212-7 at ¶¶ 2, 3.) He provided mental health counseling services by assisting inmates who had acute mental health issues and worked with doctors who developed treatment plans for inmates. (*Id*. at ¶ 4.) Yoder did not diagnose inmates, prescribe medication, or dictate treatment plans for inmates. (*Id*.) He also did not direct the actions of correctional officers and only carried out the treatment plans established by jail physicians. (*Id*.)

Yohn, a registered nurse, was employed as a Health Services Administrator by CCS at the Elkhart Jail during the relevant period. (ECF 212-6 at ¶ 3.) Her position was primarily administrative in nature because she served as the liaison between the Elkhart Jail Administration and the medical department. (*Id*. at ¶ 4.) Yohn's duties entailed ordering medical supplies, hiring medical staff, maintaining nursing staff schedules, responding to inmate grievances regarding medical issues, and handling human resource issues for the medical staff. *Id*. She did not have the authority to prescribe medications, recommend treatments, or refer patients to specialists. (*Id*.)

### March 20, 2014 to June 6, 2014

On the morning of March 20, 2014, Mayweather-Brown was booked into the Elkhart Jail. (ECF 212-3 at 55.) Immediately upon his intake, he was referred to mental health staff because he had made suicide threats to the police officers who had

transported him to jail. (*Id.* at 53-54.) However, once Mayweather-Brown arrived at the Elkhart Jail, he told the jail's staff that he was not going to harm himself. (*Id.* at 55.) Dr. John Foster, a jail doctor, prescribed Remeron (antidepressant medication), Zyprexa (antipsychotic medication), Haldol (antipsychotic medication), and Ativan (anxiety medication) for his symptoms. (*Id.* at 56.) At that time, Mayweather-Brown did not have a comprehensive intake screening because he was combative. (*Id.* at 57, 59.) Despite telling medical staff that he did not intend to harm himself, he told one staff member that, "If I go in a padded cell I will cause problems for everyone." (*Id.* at 61.)

At 2:00 p.m. on March 20, 2014, Mayweather-Brown became upset about his legal charges and was taken to a classroom to walk around and calm down. (ECF 212-3 at 73.) Twenty minutes later at 2:21 p.m., Dr. Foster was alerted that Mayweather-Brown had attempted to hang himself with a blanket and was complaining of not being able to feel his body from his neck down. (*Id.* at 76-77.) Jail officers, however, were able to see there was slack in the blanket around his neck and he was moving his head on his own. (*Id.*) Mayweather-Brown was then transported to the medical unit on a backboard where Dr. Foster observed that he was able to move his arms. (*Id.*) Dr. Foster examined him and noted that all of his reflexes were intact, and he could move all of his appendages. *Id.* He complained that he had neck pain, but while he was waiting for a neck x-ray, admitted that there was nothing wrong with his neck.[2] (*Id.* at 70-71, 76-77.)

_____

[2] At some point after Mayweather-Brown attempted to commit suicide, he was asked to remove his clothes but was reluctant to do so. (ECF 238 at 47.) Several jail officers forced Mayweather-Brown to the floor where they removed his clothing. (*Id.*) As a result of the incident, one jail officer was demoted from his supervisory position. (ECF 280-1 at 1-8.) However, that jail officer is not a defendant in this case.

At 3:30 p.m. on March 20, 2014, Mayweather-Brown refused his medication, stating "Don't give me a f****** shot. That s*** better be court ordered. I ain't taking s***." (ECF 212-3 at 68.) He was extremely agitated and aggressive, and stated that he would "get every worker here." (*Id.*) About two hours later at t 5:45 p.m., another jail doctor, Dr. Robbins ordered an Ativan injection. (*Id.* at 64-65.) However, at 8:10 p.m., he refused his medications and would not sign a refusal of treatment form. (*Id.* at 64.) At around 9:30 p.m., he tied a wire around his neck and threatened suicide. (*Id.*) However, he agreed to turn over the wire to medical staff upon receiving several cups of water. (*Id.*)

The next day, on March 21, 2014, Mayweather-Brown refused his medication and would not sign the refusal of treatment form. (ECF 212-3 at 81-82.) At 9:40 a.m. that day, he was evaluated by mental health staff. (*Id.* at 96.) They noted that he had attempted to kill himself three times in the past twenty-four hours, verbalized intentions to drown himself, threatened to bang his head on the floor until he injured himself, and injured an officer by punching and biting him. (*Id.*) Mayweather-Brown also refused his last two meals, dismantled the intercom system in his room, and tied the wires from the intercom system around his neck. (*Id.*)

At 9:47 a.m. on March 21, 2014, Mayweather-Brown refused to give his blanket and sleeping mat to jail officers. (ECF 212-3 at 92.) He was verbally abusive and threatened the officers. *Id.* Jail officers had to employ pepper spray to gain control of Mayweather-Brown and he was placed in a restraint chair. (*Id.*) Once restrained, he

stated that, after he was released from the chair, he was going to "bang [his] head on the floor until [he had] a concussion." (*Id.*) He then threatened to "kill every officer." (*Id.*)

At about 12:00 p.m., while he was still being restrained, Mayweather-Brown threatened to drown himself by putting his head in the toilet. (ECF 212-3 at 88, 93, 95.) He continued to yell, threaten himself and threaten staff, and refused to take his medications. (*Id.*) However, he later agreed to take Ativan but refused it when it was provided to him. (*Id.*) Later that evening, Mayweather-Brown declared that he was "on a water strike" and demanded to be hooked up to an IV. (*Id.* at 94.) He started drinking water and Boost, a nutritional meal shake, the next morning. (*Id.*)

Yoder, a licensed clinical social worker at the jail, initially became aware of Mr. Mayweather-Brown on March 21, 2014, during a meeting with correctional and medical staff. (ECF 212-7 at ¶ 5.) Yoder subsequently consulted with Dr. Mathew, a psychiatrist at Oaklawn Hospital, to request that Mayweather-Brown be admitted for inpatient psychiatric care. (*Id.* ¶ 6.) Dr. Mathew refused to admit him because Oaklawn was not equipped to manage his violent behavior. (*Id.*)

On March 22, 2014, Mayweather-Brown again refused to take his medications. (ECF 212-3 at 98-102.) At 12:36 p.m., Nurse Williams noted that jail staff had used pepper spray on Mayweather-Brown twice in one hour and he refused to allow the nurses to clean and bandage scratches on his arms. (*Id.* at 106.) Around 1:49 p.m., Mr. Mayweather-Brown remained verbally aggressive with staff and continued to request medical help but would then refuse help when it was offered. (*Id.*) Around 2:03 p.m., he again asked for medical help. (*Id.* at 105-06.) When medical staff asked what he needed,

he replied "I don't know, I just need help and you're not helping." (*Id.*) Mayweather-Brown continued to be verbally aggressive to medical staff. (*Id.*)

In the evening of March 22, 2014, Mayweather-Brown asked to be put in the restraint chair and stated he would harm himself if he were released from the chair. (ECF 212-3 at 105.) He refused medication, water, Boost, and a check of his vital signs. (*Id.*) Mayweather-Brown was released from the restraint chair later that evening and was given water and food. (*Id.*) Because he complained of nausea, the jail doctor ordered anti-nausea medication. (*Id.* at 104.)

The next day, on March 23, 2014, Mayweather-Brown refused his meals and medications, except for his anti-nausea medication. (ECF 212-3 at 108, 113.) At about 7:50 a.m., Mayweather-Brown complained that he could not breathe. (*Id.* at 114.) He was examined and it was noted that his oxygen saturation was at ninety-eight percent. (*Id.*) However, he refused his inhaler. (*Id.*) At 8:24 a.m., Mr. Mayweather-Brown complained of vomiting and told the nurses that he needed IV fluids and potassium. (*Id.*) He stated "[c]all the doctor and tell him that s***. I'm [] dehydrated and [will] sue you d****** nurses and doctors." (*Id.* at 114-15.) Around noon, he was given a meal tray, and he ate his lunch. (*Id.* at 115.)

On March 24, 2014, Mayweather-Brown refused his Ativan and Boost. (ECF 212-3 at 116-117.) At 8:30 a.m., he was observed sitting in his cell and did not exhibit signs of negative behavior. (*Id.* at 123-124.) Yoder followed up with him at 2:00 p.m. and noted that he remained agitated and hostile, and that he made several threats toward staff. (*Id.* at 121.) Mayweather-Brown requested that he be released from suicide watch, but

Yoder noted that his behavior did not warrant being released from suicide watch. (*Id.*) Yoder met with Mayweather-Brown's family to discuss the option of bonding him out of jail. (ECF 212-7 at ¶7.) However, they had not yet decided if they wanted to take that action and were concerned that if he were released, he would be brought back to jail immediately. (*Id.*)

At about 3:00 p.m. that day, Mayweather-Brown put his face in the toilet. (ECF 212-3 at 123.) His examination showed he had normal vital signs, but he refused to speak with the nursing staff. *Id.* Later that afternoon, he was placed in the restraint chair because he was picking paint chips off his cell wall. (*Id.*) He was released from the restraint chair by 8:20 p.m. and refused his evening medications. (*Id.*)

On March 25, 2014, Mayweather-Brown refused to take his morning medications because he felt that staff were "just trying to control [his] emotions." (ECF 212-3 at 129, 148.) At 9:40 a.m., he was observed putting a towel around his neck and, subsequently, he was placed in the restraint chair. (*Id.* at 132-34.) After being restrained, he began yelling at officers. (*Id.* at 139.) He was offered the chance to return to his cell but stated that, if he was placed back in his cell, he would get paint chips off the wall to slit his throat. (*Id.* at 148.) At around 11:15 a.m., Yoder met with Mayweather-Brown and offered to take him out of the restraint chair and place him back in his cell. (*Id.* at 144.) However, he requested that he remain in the restraint chair, stating "no, I hate it in there, I like it out here, and I can watch everything going on." (*Id.*) At 6:10 p.m., Mayweather-Brown was released from the restraint chair and was given a suicide

smock and blanket. (*Id*. pg. 149.) However, because he refused to enter his cell without a sleeping mat, he was placed back in the restraint chair. (*Id*.)

The next day, on March 26, 2014, Mayweather-Brown refused Boost and his Ativan. (ECF 212-3 at 151.) Yoder followed-up with him and noted that he became agitated when he was reminded of his many suicidal and self-harm gestures. (*Id*. pg. 154.) Yoder explained that he would need to have stable behavior for three days before he could be considered for a lower level of suicide watch. (*Id*.) This news agitated Mayweather-Brown and he began at Yoder. (*Id*.) In fact, he told Yoder repeatedly that jail staff was "depriving him of his rights." (*Id*.)

On March 27, 2014, Mayweather-Brown refused his Boost and Ativan. (ECF 212-3 at 159-60.) Yoder followed-up with him and noted that his behavior had improved somewhat. (*Id*. at 162.) Mayweather-Brown requested that he be downgraded to a level-three suicide watch (a less intensive level of suicide observation, but Yoder told him that his suicide level could not be lowered that day. (*Id*.) His behavior then escalated, and he began swearing at Yoder, who noted that "unless [he] give Mr. Mayweather-Brown exactly what he wants he will be certain everyone knows he is pissed about the alternatives." (*Id*.) Yoder also noted that jail staff had raised concerns that Mayweather-Brown was adversely impacting them. (*Id*.) However, on March 27, 2014, there were reports of Mayweather-Brown attempting to harm himself. (*Id*. at 165.)

On March 28, 2014, Dr. Robbins placed Mayweather-Brown on a level-three suicide watch. (ECF 212-3 at 171.) Later in the day, however, when he learned that his family would not post bond to release him from jail, his behavior escalated. (*Id*.) He

began screaming "I'm going to finish what I started, this is going to be a long weekend." (*Id.*) Yoder reported that his anger was completely unmanageable. (*Id.*)

On March 29, 2014, Mayweather-Brown reported that he was throwing up and needed medical assistance. (ECF 212-3 at 180.) He was verbally aggressive and refused the liquid diet ordered by the medical provider. (*Id.*) A nurse examined him and noted there were no signs of vomit in his cell, and he did not appear to be malnourished or dehydrated. (*Id.*) The nurse explained to Mayweather-Brown that emotional upset can cause stomach upset, and he responded by saying "you don't know nothing b**** move out of the way." (*Id.*)

At 7:50 p.m. on March 29, 2014, Mayweather-Brown was observed talking with the chaplain but did not exhibit negative behaviors. (ECF 212-3 at 182.) At 9:30 p.m., medical staff was notified that he was ripping his sleeping mat cover apart and telling officers that he was going to "slit his f****** wrist." (*Id.*) Mayweather-Brown was put in the restraint chair briefly, and then released back to his cell when he agreed to take his Ativan. (*Id.*)

In March 2014, Mayweather-Brown continued to display aggressive behavior. For example, on March 30, 2014, he remained on level-two suicide watch. (ECF 212-3 at 184.) The next day, on March 31, 2014, an Elkhart Superior Court Judge authorized jail doctors to administer medication over his objection due to his extreme behavior. (*Id.* at 185.) On that day, he also made several gestures to harm himself by tying things around his neck. (*Id.* at 187.)

On April 1, 2014, Mayweather-Brown refused to take his medications. (ECF 212-3 at 199.) Mental health staff followed-up with him and noted that he blamed the jail officers' actions for his outbursts and negative behavior. (*Id.* at 201.) For example, he told officers that he would tear up a padded cell if he were put in one and, after officers put him in a padded cell, he destroyed it. (*Id.*) Mayweather-Brown felt that this was the jail officers' fault. (*Id.*)

On April 2, 2014, Mayweather-Brown refused his morning medications. (ECF 212-3 at 204.) He was released from suicide precautions and housed in the K-pod. (*Id.* at 207.) He expressed anxiety about being taken off of suicide watch status but remained hopeful that his sister would bond him out of jail the next day. (*Id.*) Furthermore, in early April 2014, Mayweather-Brown also refused to take his Zyprexa and Remeron medications. (*Id.* at 222, 225.)

On April 10, 2014, at about 3:30 p.m., Mayweather-Brown reported that he ingested multiple pills and swallowed shampoo. (ECF 212-3 at 233, 236.) Dr. Foster examined him and reported that he exhibited this behavior because he could not get in contact with his sister. (*Id.* at 223.) Dr. Foster advised that, even after taking multiple Thorazine and Ativan tablets, he was still below the daily maximum dose for these medications and they should not cause him any medical problems. (*Id.* at 235.) At 4:00 p.m., Mayweather-Brown was in his cell and urinated on himself. (*Id.* at 236-37.) He urinated on himself again around 4:40 p.m., 5:15 p.m., and 5:50 p.m. (*Id.*)

On April 11, 2014, Mayweather-Brown refused his morning medications. (ECF 212-3 at 238, 240.) During a mental health assessment that day, he told staff that he

"made the whole story up—I didn't intend to kill myself." (*Id*. at 242.) Dr. Robbins

noted that he made up his attempted overdose and expressed his desire to be taken off

of suicide watch. (*Id*. at 244.) At 10:00 p.m., he refused his Zyprexa, saying "I don't want

the Zyprexa but I want the others. I don't know why I don't want it, I just don't want

it." (*Id*. at 247.) He also threatened jail staff, saying "I'm getting really sick of this, I got a

big lawsuit coming with the news and everything coming, lots of people are going to

lose their jobs." (*Id*.)

The next day, on April 12, 2014, Mayweather-Brown once again refused his

morning medications. (ECF 212-3 at 248.) The next day, on April 13, 2014, he remained

on a level-two suicide watch. (*Id*. at 250-51.) He refused his antipsychotic medication

because he believed that the "jail was trying to find him incompetent" and he wanted

"to show everyone that he does not need the medication." (*Id*.) Mayweather-Brown did

not engage in disruptive behavior and requested Ativan at 11:15 p.m. for agitation. (*Id*.

at 252.)

On April 14, 2014, Mayweather-Brown stated he would not take Zyprexa because

he was no longer taking antipsychotic medication. (ECF 212-3 at 253.) At 7:30 a.m., he

was observed by mental health staff resting in his cell with his sleeping mat and

blanket. (*Id*. at 257.) He had a discussion with mental health staff about his mental

health diagnosis and the criteria needed to be considered for a state mental hospital. (*Id*.

at 256.) Around 2:00 p.m., Mayweather-Brown became upset when his medication was

crushed into a cup without him watching. (*Id*. at 254.) He cursed, yelled at, and

threatened the nursing staff. (*Id*.) The nursing staff told Mayweather-Brown that they

would crush the medication with him watching, and they offered to do that immediately, but he refused his medications. (*Id.*)

On April 15, 2014, Mayweather-Brown refused to take his morning medications. (ECF 212-3 at 258.) Yoder followed-up with him on suicide watch and noted that he had voiced no suicidal ideations. (*Id.* at 261.) He was antagonistic toward nursing staff. (*Id.*) Yoder noted that he had been seen by Dr. Robbins, who opined that he was controlling and his attention seeking behavior was consistent with anti-social personality disorder. (*Id.*) At 10:00 a.m., he was cleared from suicide watch to return to general population. (*Id.* at 264.)

Also, on April 15, 2014, Mayweather-Brown wrote a letter to the Elkhart County Sheriff, Bigler, and Perry. (ECF 212-3 at 259.) In his letter, he explained that he had been intentionally provoked by being placed in situations "knowing full well where the situations have led to in the past." (*Id.*) He further explained that he had a well-documented history of post-traumatic stress disorder (P.T.S.D.), which had never been documented by mental health staff, and claimed the jail staff was mentally abusing him by placing him in situations he did not like and "triggering his P.T.S.D." (*Id.*)

The next day, on April 16, 2014, Yoder assisted in developing a mental health treatment plan for Mayweather-Brown. (ECF 212-3 at 266.) He was diagnosed with impulse control disorder and antisocial personality disorder. (*Id.*) The focus of the treatment plan was to manage his agitation and suicidal gestures. (*Id.*)

On April 17, 2014, Mayweather-Brown refused to take his morning medications. (ECF 212-3 at 268.) At 7:00 a.m., medical staff was called to his cell because he reported

being short of breath. (*Id.*) When a nurse arrived at his cell, Mayweather-Brown refused to do a pulmonary function test, stating "I don't need to do all that cause it's going to throw me into an attack….see you nurses all don't know what the h*** you [are] doing." (*Id.*) The nurse who examined him noted that his oxygen saturation was ninety-six percent and he was neither whistling nor wheezing, and his breathing was even and unlabored. (*Id.*) When the nurse gave Mayweather-Brown his inhaler, he did not take puffs from it but instead simply gave it back to her and walked upstairs. (*Id.*)

On April 18, 2014, Yoder met with Mayweather-Brown and noted that he continued to request changes in his medication. (ECF 212-3 at 272.) He denied that he was psychotic and refused to take antipsychotic medication but requested Geodon (antipsychotic medication). (*Id.*) He also expressed anxiety over his pending court hearings. (*Id.* at 273.)

On April 24, 2014, Mayweather-Brown was scheduled for a chronic care asthma visit with Dr. Foster. (ECF 212-3 at 280.) Dr. Foster noted that he initially refused to go to his appointment but arrived later in the day to see him. (*Id.*) During the appointment, he threatened physical violence if he could not immediately leave the appointment and then left with another group of inmates and went back to his unit. (*Id.* at 279-80, 283.) Dr. Foster noted that he manipulated medical staff by refusing to use his Albuterol inhaler and then would ask to use it immediately after nurses left his unit. (*Id.* at 280.) He also noted that Mayweather-Brown's asthma was mild and could be controlled with medication, but he was non-compliant and deceptive in saying that nurses did not bring him his medication. (*Id.* at 282.)

Five days later, on April 29, 2014, Mayweather-Brown once again refused to take his morning medication. (ECF 212-3 at 286.) That day, he also refused his evening medications stating: "I plan to be in the chair all night so I don't need them." (*Id.* at 287.) At 5:45 p.m., he asked to be seen by medical staff. (*Id.* at 299.) However, after medical staff arrived, he refused to identify his medical issue and refused to speak with the nurse because he "doesn't like" the nurse who was available to see him. (*Id.*) The medical staff left after Mayweather-Brown refused care, and he became aggressive and combative with jail officers and was placed in the restraint chair. (*Id.* at 299, 301.) The medical staff then returned thirty minutes later because he stated he was having an asthma attack. (*Id.* at 299.) However, once the medical staff arrived, they observed Mayweather-Brown was not in distress because he was yelling and cursing at jail officers. (*Id.*) He was administered his asthma inhaler. (*Id.*)

After being placed in the restraint chair, Mayweather-Brown refused to have restraint chair assessments at 5:45 p.m., 6:00 p.m., 6:05 p.m. 6:30, p.m., 6:40 p.m., 7:00 p.m., 7:30 p.m., 7:37 p.m., and 8:00 p.m. (ECF 212-3 at 288-96.) At 6:30 p.m., he stated "I'll sit in this chair all night, this doesn't bother me, I'm fine." (*Id.* at 293, 300.) At 7:30 p.m., he was heard yelling at officers, stating "I'm suing you personally Cole, I'm coming after you and your job." (*Id.* at 300.) By 7:37 p.m., he told medical staff to call the doctor and tell them that an officer was "personally messing with [his] P.T.S.D. and whatever happens is not [his] problem." (*Id.*) He was taken out of the restraint chair at 9:18 p.m. (*Id.* at 301.)

The next day, on April 30, 2014, Mayweather-Brown refused his morning asthma medications. (ECF 212-3 at 303.) At 2:30 p.m. that day, mental health staff attempted to talk with him about his behavior that led to his placement on suicide watch. (*Id.* at 311.) He admitted to threats of self-harm, said he was not suicidal, and did not need to be on suicide watch. (*Id.*) He blamed his threats of self-harm on jail officers because they triggered his P.T.S.D. (*Id.*) Mayweather-Brown showed the mental health staff worker a plastic spoon and said he was going to harm himself. (*Id.*) He then proceeded to make cutting actions at his wrist with the spoon. (*Id.*)

At 2:50 p.m. that day, Mayweather-Brown requested that he be placed in the restraint chair. (ECF 212-3 at 310.) He refused to turn over his plastic spoon to jail officers. (*Id.*) At 3:10 p.m., he yelled to Nurse Emily Emery that he was going on a hunger and water strike. (*Id.* at 309.) Twenty minutes later, Katherine Brown, a mental healthcare worker, spoke with Mayweather-Brown, who was yelling and wanted to know why he was on suicide precautions. (*Id.* at 311.) Brown responded that he was on suicide precautions due to the threats of self-harm that he had made the previous day. (*Id.*) This caused him to escalate his behavior and he threatened to bang his head against a railing, saying "what are you going to do to stop me?" (*Id.*) He also stated that he was being discriminated against. (*Id.*) At 4:00 p.m., Mayweather-Brown refused to let jail officers restrain his right hand in the restraint chair. (*Id.* at 310.) He then became violent with custody officers, made verbal threats, and began thrashing his body around in the restraint chair. (*Id.*) He refused medical checks every twenty minutes while in the restraint chair. (*Id.*) At 6:36 p.m., he requested that medical staff check his vital signs

and clean a cut on his right shoulder. (*Id.* at 312-13.) Medical staff attended to his needs and noted he was eating and drinking water so his hunger and water strike had ended. (*Id.*)

On April 30, 2014, Mayweather-Brown underwent a self-harm initial assessment. (ECF 212-3 at 314.) Mental health staff noted he made suicidal statements to jail officers after he became upset that he could not make copies. (*Id.*) He informed Mary Marcus, a mental healthcare worker, that he was not suicidal and denied saying anything related to self-harm. (*Id.* at 315.)

The next day, on May 1, 2014, a 11:30 a.m., jail officers observed Mayweather-Brown attempting to harm himself. (ECF 212-3 at 323.) They tried to place him in the restraint chair but he became combative and spit at them. (*Id.*) He then grabbed the officers' hands and tried to twist and break their fingers. (*Id.*) Mayweather-Brown hit the officers with his knees and attempted to use his head as a weapon. (*Id.*) After being placed in the restraint chair, he threated officers, saying "I'm going to f*** you up! Stop touching me, I'll kill you! You don't have a soul." (*Id.* at 339.)

That same day while he was still in the restraint chair, Dr. Foster examined Mayweather-Brown to access his chronic asthma. (ECF 212-3 at 329-31.) He noted that Mayweather-Brown's biggest hurdle to his health was himself and he would be healthier if he were compliant with his medications. (*Id.*) Brown also followed up with him and noted the incident began when he was given a normal sack lunch instead of a

special lunch.[3] (*Id.* at 336-37.) Mayweather-Brown reported that he is unable to control himself when his anger is triggered. (*Id.*) He requested that medical staff, mental health staff, and jail officials develop treatment plan to respond to his behavior. (*Id.*)

On May 2, 2014, Mayweather-Brown was given his medication at which time he informed the medical staff that he would not take the medication and would not give it back. (ECF 212-3 at 341, 345.) He was also examined for complaints of a strained neck and he was given an ice pack. (*Id.* at 342-44.) At 5:25 p.m., Mayweather-Brown refused to return the ice pack and stated that "the officer over there pissed me off so I'm not giving this back and [I am] going to eat it." (*Id.* at 349.) At 8:10 p.m., while a nurse examined him, he stated to her "Nurse, look I am cutting myself. Nurse, I am harming myself aren't you going to do anything?" (*Id.* at 349.) The nursing staff was advised that they should not enter his cell because of his hostility toward them, which increased his anger. (*Id.*)

At 9:00 p.m. that same day, a nurse observed Mayweather-Brown in his cell with a small metal object that he was using to make small lacerations to his left arm. (ECF 212-3 at 345-46.) He requested that the nurse clean and bandage his cuts, but jail staff advised the nurse not to enter the cell as long as he had the piece of metal. (*Id.*) He refused to give jail officers the piece of metal and appeared agitated and combative. (*Id.*) Several hours later at 11:00 p.m., a nurse observed Mayweather-Brown yelling at a jail officer stating, "I don't like your face Goodwin, you make me agitated." (*Id.* at 345.) The

---

[3] Mayweather-Brown was given a special lunch the day before, in response to his threat of a hunger strike. (ECF 212-3 at 336-37.)

nurse gave him Tylenol and allergy medicine in a cup, but he took the cup, dumped the water out, and kept the medication. (*Id.*) He stated, "I'm not taking these meds and I'm not giving the cup back, you guys can come in and get it." (*Id.*) However, jail officers did not enter the cell to retrieve the medication or the cup. (*Id.*)

On May 3, 2014, Dr. Foster discontinued Mayweather-Brown's Tylenol and allergy medication because he refused to take the medications the day before. (ECF 212-3 at 345, 351.) At 1:25 a.m., a nurse was called to examine Mayweather-Brown. (*Id.* at 353.) He reported that he had been banging his head on the wall and, as a result, had a headache and experienced blackouts. (*Id.*) The nurse explained she could not enter his cell and provide care until he calmed down. (*Id.*) At 2:21 a.m., Mayweather-Brown requested Ativan and Geodon and took these medications. (*Id.*) He also stuck his left arm out of the slot in his door and allowed a nurse to clean and bandage ten superficial cuts on his arm. (*Id.*) At 4:12 a.m., jail officers informed the nursing staff that he had refused his breakfast and announced he was going on a hunger strike. (*Id.*) At 6:20 a.m., Mayweather-Brown refused his dinner and said he would not drink any water. (*Id.*) However, he later drank 120 milliliters of water. (*Id.*)

At 2:10 p.m. on the same day, Mayweather-Brown ate ten percent of his lunch and asked to speak with mental health staff regarding his hunger strike. (ECF 212-3 at 357-58.) The nursing staff observed him making verbal threats against the medical and jail staff. (*Id.*) At 4:45 p.m., he consumed two Boost supplements. (*Id.*)

On May 5, 2014, Mayweather-Brown refused to take Geodon. (ECF 212-3 at 359.) Between 1:10 p.m. and 2:30 p.m., he became very upset that he was being given

nutraloaf[4] instead of normal meals and stated he would remain on a hunger strike until he got regular food. (*Id.* at 360, 365.) He was then given two Boost supplements, which he drank. (*Id.* at 360.) Mayweather-Brown still had the metal object that he used to cut his arm on May 2, 2014. (*Id.*) He was told that he would not be moved to level-three suicide watch until he surrendered the piece of metal. (*Id.*) At 3:40 p.m., he was moved from level-two suicide watch to a level-three suicide watch because he remained calm all day. (*Id.* at 360, 363.)

On May 6, 2014, Mayweather-Brown requested that he return to general population. (ECF 212-3 at 367.) He acknowledged that he allowed people to get under his skin and then acted out to prove them right. (*Id.*)

On May 8, 2014, at 6:00 p.m., Mayweather-Brown requested his asthma inhalers. (ECF 212-3 at 372.) The nurse told him that he no longer had an "as needed" order and would have to wait until he had a medical pass. (*Id.*) At 6:50 p.m., Mayweather-Brown's cellmate alerted medical staff that he was unresponsive. (*Id.*) Nursing staff arrived and observed him sitting on the floor with no signs of respiratory distress. (*Id.*) He refused to answer any questions until he received his inhalers. (*Id.*) The nurse allowed him to use his inhaler, even though he was not showing any signs of respiratory distress. (*Id.*) Mayweather-Brown put in a request for health care, complaining of extreme neck pain due to the jail officers' use of force. (*Id.* at 373.) His neck was examined; however, there was no swelling. (*Id.*) He was prescribed Tylenol for muscle aches. (*Id.*)

---

[4] Nutraloaf is a food like meatloaf in texture that is served to inmates who have misbehaved that does not require the use of utensils.

On May 9, 2014, Mayweather-Brown was placed on suicide watch because he made suicidal statements, which he later denied. (ECF 212-3 at 375.) After being placed on suicide watch, he engaged in a series of self-injury behaviors. (*Id.*)

On May 10, 2014, Mayweather-Brown complained that he had a torn ligament in his neck and stated he should not have to be triaged because he was allegedly injured by jail officers' use of force. (ECF 212-3 at 378.) He was given Tylenol for his neck pain and had no behavioral issues on May 10, 2014. (*Id.* at 381-82.)

On May 11, 2014, Mayweather-Brown was compliant with his medications except for the Geodon. (ECF 212-3 at 383.) He stated he had chronic migraines, which he had never complained about before, and asked for medication. (*Id.*)

The next day, on May 12, 2014, someone placed a call from the intercom system in Mayweather-Brown's cell to inform prison staff that someone was thinking of suicide. (ECF 212-3 at 385.) Both Mayweather-Brown and his cellmate denied making the call and the inmates were placed on suicide watch. (*Id.*) Mayweather-Brown was later observed sitting on his bunk and singing. (*Id.* at 387.)

On May 13, 2014, Mayweather-Brown told mental health staff that he was highly agitated because he felt things at the jail should be done differently. (ECF 212-3 at 388.) He was loud and demanding at that time. (*Id.*)

Two days later, on May 15, 2014, Mayweather-Brown refused to take Geodon. (ECF 212-3 at 393.) He was later placed on suicide watch at his request. (*Id.* at 394.) He stated he was angry and did not want to his behavior to escalate. (*Id.*) He also indicated that he did not want to be housed in the K-42 pod (mental health unit) any longer. (*Id.*)

On May 16, 2014, Mr. Mayweather-Brown told Mr. Yoder that he did not have any suicidal ideation, and he requested to be on suicide watch so that he could clear his head. (ECF 212-3 at 397.) Mr. Mayweather-Brown said that he felt too confined in the K-42 pod (the mental health unit) and requested placement in general population. (*Id.*)

At 1:30 p.m. on May 17, 2014, Mayweather-Brown became agitated and verbally threatened others. (ECF 212-3 at 401-02.) He stated that he "is suing all of medical and none of you mother******* will have anything left when I'm done with ya." (*Id.*) He then began throwing paper, tubes of toothpaste, and other items through the tray slot in his door. (*Id.*) Mayweather-Brown also began squirting water from the toilet using a glove and was aiming at jail and medical staff, and electronic equipment. (*Id.*) He requested Ativan and after taking it, he was calm and laughing with other inmates. (*Id.*)

The next day, on May 18, 2014 at 8:10 a.m., Mayweather-Brown was seen sleeping in his cell with no behavioral issues. (ECF 212-3 at 413-14.) At 11:00 a.m., he began flooding his cell and yelling "I will hit my head against this wall until I'm put in the chair!" (*Id.*) He initially refused a vital sign check that morning but allowed the medical staff to take his vital signs at 11:55 a.m. (*Id.*) He drank thirty-two ounces of water at 11:55 a.m., and eight ounces of water at 12:25 p.m. (*Id.*) Mayweather-Brown then yelled "I am going to make sure to stay in this chair until first shift! Ya'll wanna learn how to do what I do? This video will be on YouTube, take a lesson from me. I can tear this place down! I already know how I'm gonna get outta this chair. Now I'm hydrated, b******! It's on! Cooley, you're a b****." (*Id.*) He continued yelling at jail and medical staff as well as other inmates and broke a railing while in the restraint chair.

(*Id.*) At 5:00 p.m., he complained of sudden headaches after being placed in the restraint chair earlier in the day. (*Id.* at 407-09.) Nursing staff provided him with Tylenol. (*Id.*) He made a similar complaint around 9:00 p.m. (*Id.* at 413.)

On May 19, 2014, Yoder followed-up with Mayweather-Brown and noted he had been more stable until the last ten days, when he had two separate instances on suicide watch. (ECF 212-3 at 415-17.) His behavior had escalated over the last forty-eight hours, but he was currently calm and rationale. (*Id.*) Yoder noted that he saw little desire on the part of Mayweather-Brown to change his behavior. (*Id.* at 415-19.) He assessed Mayweather-Brown as being narcissistic, anti-social, and made everyone miserable if he did not get what he wanted. (*Id.*)

The next day, on May 20, 2014, Mayweather-Brown refused to take his morning medications. (ECF 212-3 at 423.) At 10:15 a.m., he was briefly placed in the restraint chair. (*Id.* at 424.) After being released to his cell at 10:18 a.m., he ripped his shirt and banged his head against the windows. (*Id.*) Mayweather-Brown also began cutting his wrist with a piece of a comb. (*Id.* at 429.) At 11:00 a.m., Yoder observed him after he was placed on suicide watch. (*Id.* at 426-27.) He noted that Mr. Mayweather-Brown had verbalized suicidal ideations to jail officers, and this was his third time on suicide watch in two weeks. (*Id.*) Yoder noted that he was hostile about a multitude of perceived injustices and that it was his view that the only way to respond to these injustices was to act out. (*Id.*)

Between 1:00 p.m. and 2:00 p.m. on May 20, 2014, Brown, a mental healthcare worker, met with Mayweather-Brown while he was on level-two suicide watch. (ECF

212-3 at 425.) Brown reported that he had been making superficial cuts to his left arm using a piece of plaster he picked off his cell wall. (*Id.*) He believed that he was being treated unfairly because he was only allowed to have the safety smock and safety blanket in his cell with him. (*Id.*) However, he admitted that he tore the smock before it was taken away from him. (*Id.*) Mayweather-Brown also threw his lunch tray at the wall and urinated on the floor of his cell. (*Id.* at 425.) He then requested a clean cell and a blanket. *Id.* He was told that he would need to remain calm for a period before jail officers would move him to another cell. (*Id.*) He would also need to refrain from harming himself before he would be given a blanket. (*Id.*) At 2:15 p.m., Mayweather-Brown began making superficial cuts to his neck and stated that he wanted to bleed everywhere. (*Id.* at 425, 428-29.) Nursing staff noted he had superficial scratches to his neck but none of them were actively bleeding. (*Id.* at 428.) Three hours later at 5:21 p.m., Mayweather-Brown called out for medical staff to clean his wounds, but he would not surrender the paint chip to jail officers and continued to scratch himself. (*Id.* at 432.) He was told that he would be treated after he stopped scratching himself. (*Id.*) At 8:30 p.m., a nurse was able to clean and bandage the cuts on his arm. (*Id.* at 433.)

On May 21, 2014, Mayweather-Brown refused to take his morning medications. (ECF 212-3 at 434.) He spoke with mental health staff and explained that his behavior the night before was predicated on the fact that he had not been able to file charges against an officer who had injured him while he was being placed in the restraint chair. (*Id.* at 439-41.) At 6:20 p.m., he told a nurse that if he was not triaged, he would stab himself in the neck. (*Id.* at 438.) He was then observed holding a broken plastic spoon in

his hands. (*Id.*) He stated that he was upset because his neck was sore since he did not get a mat to sleep on until 11 p.m. the night before. (*Id.*) Because he was told that a nurse would not be available to triage him immediately, he continued to scream and threatened to hurt himself. (*Id.*) Yoder then advised jail officers to remove the plastic spoon from his cell and keep him on level-two suicide watch. (*Id.*) At 7:30 p.m., he was observed holding pieces of ripped blanket that had been tied together. (*Id.* at 437.) He was persuaded to hand over the strings and ripped blanket and admitted he behaved this way so that he others would listen to him. (*Id.*)

The next day, on May 22, 2014, Yoder followed up with Mayweather-Brown on suicide watch. (ECF 212-3 at 445-46.) He reported that he wanted to return to the K-42 unit because "it's going to be a long weekend, and I will need my mattress." (*Id.* at 446.) At 5:50 p.m., a nurse applied bandages to his scratched forearm. (*Id.* at 447.) At 9:30 p.m., Mayweather-Brown told a nurse that Dr. Robbins was going to clear him from suicide watch and return him to the general population. (*Id.*)

In late May 2014, Mayweather-Brown continued to be treated by jail officials. For example, on May 23, 2014, Dr. Robbins met with him and renewed his Geodon prescription. (ECF 212-3 at 449-50.) Several days later, on May 27, 2014, Yoder met with Mayweather-Brown and discussed his anxiety over his sister spending his social security checks and asked Yoder to call his sister to find out about the money. (*Id.* at 449-50.)

In June 2014, Mayweather-Brown refused medical treatment and was placed on suicide watch. For example, on June 4, 2014, after refusing to allow medical staff to treat

him, he signed a refusal of treatment form. (ECF 212-3 at 465.) A day later, on June 5, 2014, Mayweather-Brown was referred to a medical provider due to his non-compliance with his Ativan and Geodon. (*Id*. at 466.) Next, on June 22, 2014, at 9:00 p.m., he announced over the intercom that he wanted to kill himself and was subsequently placed on level-two suicide watch. (*Id*. at 469, 470.)

The next day, on June 23, 2014, Mayweather-Brown refused to take his morning medication. (ECF 212-3 at 471.) That morning, he had a conflict with his cellmate about who would have time outside of the cell. (*Id.* at 474.) Mayweather-Brown asked to be placed on suicide watch so that he could be moved out of his housing unit. (*Id.*) He did not express any threats of self-harm. (*Id.* at 475.)

On June 24, 2014, Mayweather-Brown once again refused to take his morning medication. (ECF 212-3 at 477.) He asked to be taken off of suicide watch but was told that he would be kept on suicide watch for another twenty-four hours. (*Id.* at 479.)

On June 24, 2014, Yoder met with Mayweather-Brown and noted he did not exhibit any dangerous behavior and did not verbalize suicidal ideations. (ECF 212-3 at 481.) Yoder planned to transition him to the K-42 pod because he would only be in the Elkhart Jail for another week and his behavior could be managed if he were not near the inmate with whom he had an issue. (*Id.* at 481-82.)

On July 1, 2014, Mayweather-Brown left the Elkhart Jail. (ECF 212-3 at 487, 499, 503.) He returned on July 18, 2014, but he left again on July 21, 2014. (*Id*.) Between May 2, 2015 and May 29, 2015, he was in and out of the Elkhart Jail. (*Id*.)

*May 29, 2015 to January 21, 2016*

After returning to the Elkhart Jail, on May 29, 2015, Mayweather-Brown was placed in the restraint chair from 6:30 p.m. to 7:47 p.m. because he had an altercation in the housing pods. (ECF 212-3 at 518, 521.) The next day, on May 30, 2015 at 2:40 p.m., he was advised jail officers that he was having suicidal thoughts. (*Id.* at 531.) Yoder was informed of the situation and recommended that Mayweather-Brown be placed on suicide watch. (*Id.*) At 8:50 p.m., a nurse followed up with him and he stated, "I'm fine, I just couldn't be in seg[regation], I can do this all day but I can't do seg[regation]." (*Id.*)

Between June 1, 2015, and June 26, 2015, Mayweather-Brown was periodically in and out of the Elkhart Jail. (ECF 212-3 at 541.)

On June 1, 2015, Yoder followed up with Mayweather-Brown on suicide watch and reported he made veiled suicide threats after he was sent to segregation for being written-up. (ECF 212-3 at 547.) He admitted that he made these threats so that he would be housed in a unit where he could think clearly. (*Id.* at 548, 549.)

On June 4, 2015, Yoder met with Mayweather-Brown while he was on suicide watch. (ECF 212-3 at 565.) Yoder noted that he was not dangerous and that he was angry over how he was being treated. (*Id.*)

A week later, on June 11, 2015, Dr. Foster examined Mayweather-Brown. (ECF 212-3 at 571-74.) Dr. Foster noted that he had been at another facility and had recently returned to the Elkhart Jail. (*Id.* at 571.) He also noted that he would make a nebulizer available to treat Mayweather-Brown's asthma. (*Id.* at 574.)

On June 24, 2015, Mayweather-Brown was once again placed on suicide watch. (ECF 212-3 at 594.) Yoder noted that he was agitated by a recent court hearing and by the denial of his request to be transferred to minimum security housing. (*Id.* at 593.)

The next day, on June 25, 2015, Yoder met with Mayweather-Brown on suicide watch. (ECF 212-3 at 595-96.) Yoder noted that he made suicide threats because he wanted to be placed in minimum security housing. (*Id.* at 596.) Yoder noted that Mayweather-Brown's statements were primarily manipulative. (*Id.*)

On June 26, 2015, Yoder followed up with Mayweather-Brown on suicide watch at which time Mayweather-Brown expressed his irritation over his security placement. (ECF 212-3 at 598.) He implied that he would "go off" if things did not go his way and he would need the restraint chair. (*Id.*) Several days later, on June 30, 2015, Dr. Joshua Mathew[5], a psychiatrist, conducted an initial psychiatric evaluation of Mayweather-Brown. (ECF 212-3 at 599-601.) He initially noted that Mayweather-Brown had a history of extreme attention-seeking behavior, manipulating others by threatening self-harm, and uncontrollable behavior. (*Id.*) Mayweather-Brown told Dr. Mathew that he was justified in acting out. (*Id.* at 599.) Dr. Mathew documented his antisocial personality and impulse control disorders. (*Id.*) He did not assess Mayweather-Brown as having bipolar or major mood disorders. (*Id.* at 601.)

---

[5] Dr. Mathew previously worked at Oaklawn Hospital and denied Mayweather-Brown admission because of his aggressive behavior. But by June 2015, Dr. Mathew was working at the Elkhart Jail and employed by Correct Care Solutions. (ECF 215-5 at ¶¶ 3, 5.)

At 7:40 p.m. that same day, Mayweather-Brown told a nurse and jail officers that he wanted to hurt himself. (ECF 212-3 at 603.) The nurse asked him to repeat himself and he screamed at her because he had already stated he would hurt himself and did not want to say it again. (*Id.*) The nurse asked him again if he was going to hurt himself and he responded, "take it however you want." (*Id.*) Mayweather-Brown then stated, "you had better get mental health here because they are fixing to see how I can really act and by the end of the night I will be in the restraint chair and nobody will be safe tonight." (*Id.*) Yoder was consulted and recommended that he be placed on level-three suicide watch. (*Id.*) Mayweather-Brown responded by stating "the only way you will move me is with force." (*Id.*)

On July 1, 2015, Mayweather-Brown refused his morning inhaler and Clonidine (high blood pressure medication). (ECF 212-3 at 609.) At 1:00 a.m., he was agitated and yelling that he was suing the jail and medical staff. (*Id.* at 614.) He stated that he was suicidal earlier and should have been moved. (*Id.*) Jail officers did not move him because he attempted to fight with them. (*Id.*) Mayweather-Brown then proceeded to complain about his jail experience and that he planned on suing the Elkhart Jail. (*Id.*) Yoder met with Mayweather-Brown at 12:00 p.m. and documented that, on the previous day, he made suicidal threats and superficial cuts to his wrists with a spoon. (*Id.* at 610, 613-14.) Yoder noted that Mayweather-Brown acted out when he perceived that he was being mistreated. (*Id.* at 610.) He described in meticulous detail for Yoder why he was the victim and stated, "don't you understand I might say anything if I'm pissed off?" (*Id.* at 612, 614.)

On July 2, 2015, Mayweather-Brown was placed in the mental health unit. (ECF 212-3 at 617.) However, he was unhappy about the placement because he thought he deserved to be placed in "minimum security." (*Id*.) Yoder noted that he had been only marginally compliant with his medication and was typically non-complaint if he was angry. (*Id*.) Yoder advised Mayweather-Brown that to be reconsidered for placement in different housing he would need to remain stable for over thirty days. (*Id*.) He responded stating "Gary, you know that will never happen." (*Id*.)

Three days later, on July 5, 2015, Mayweather-Brown refused to take his morning medication. (ECF 212-3 at 618.) The next day, on July 6, 2015, he refused his Clonidine (*id*. at 619), and, on July 7, 2015, he also refused to be triaged for his back pain, (i*d*. at 620).

On July 8, 2015, Mayweather-Brown expressed suicidal ideation because he was angry about his housing placement. (ECF 212-3 at 622.) He was placed on level-three suicide watch and he told Yoder that "When I'm pissed I might say something. I'm not going to hurt myself." (*Id*. at 624.) The next day, on July 2015, Mayweather-Brown refused his Clonidine. (*Id*.)

On July 10, 2015, at 6:00 p.m., while inside his cell, Mayweather-Brown yelled to a nurse that he was going to hang himself and then placed a piece of fabric against is throat. (ECF 212-3 at 626.) The nurse reported that he was irrational, yelling obscenities, and inconsolable. (*Id*.) Mayweather-Brown assaulted two jail officers and was placed on level-three suicide watch. (*Id*.) At 7:40 p.m., he requested to be seen for back pain. (*Id*. at 625.) An examination showed that he had no outward signs or symptoms of pain or

difficulty with movement. (*Id.*) Dr. Foster did not issue any new orders as Mayweather-Brown was already taking Tylenol. (*Id.*)

On July 12, 2015, Mayweather-Brown was angry because he was given ground chicken instead of chicken nuggets, refuse his lunch tray, and asked to be given a new tray. (ECF 212-3 at 630.) That day, he also covered the inside of his cell window with paper. (*Id.*)

The next day, on July 13, 2015, Mayweather-Brown made suicidal threats to jail officers and remained on suicide watch. (ECF 212-3 at 632.) He told Yoder that he got "pissed when he is disrespected and not given what it right." (*Id.*). Yoder opined that he acted out because he could get more attention and create more conflicts with jail officers. (*Id.*) Yoder documented that he had not seen Mayweather-Brown seriously contemplate suicide. (*Id.*) Then, on July 14, 2015 and July 16, 2015, he again refused to take his medication. (*Id.* at 633-34.)

On July 17, 2015, Yoder followed up with Mayweather-Brown on suicide watch and noted there had been less conflict since he was placed in the mental health unit. (ECF 212-3 at 636.) Yoder opined that Mayweather-Brown was struggling to find things to complain about in his unit. (*Id.*) He requested that he take Clonidine at night because it made him drowsy. (*Id.* at 637.) Dr. Mathew changed the order. (*Id.*)

Two days later, on July 19, 2015, Mayweather-Brown refused to take his morning asthma medication. (ECF 212-3 at 641.) At 9:30 a.m. that day, he stated that he would hang himself because his television was not turned on. (*Id.* at 643.) He was then placed on level-three suicide watch. (*Id.*) Jail officers escorted Mayweather-Brown to the

medical unit where he told the medical staff they were not doing their jobs and he threatened to file a lawsuit if they did not start doing their jobs. (*Id.* at 645.) He then became aggressive and jail officers escorted him to the booking unit. (*Id.*) At 9:50 a.m., Mayweather-Brown was placed in the restraint chair. (*Id.* at 645-46.) Around 9:55 a.m., a nurse attempted to check his feet, but he responded "you better not touch me you fat f****** nasty a** b****, you try to take my socks and you will have to do a use of force. You better not touch me. Quit provoking me." (*Id.* at 649.)

By 10:00 a.m. that day, Mayweather-Brown was able to get out of the shoulder restraints of the restraint chair and stated, "I told you I'd be out of them in [three] minutes." (ECF 212-3 at 649.) He continued yelling and threatening jail officers, but they managed to place him back in the shoulder restraints. (*Id.*) At 10:10 a.m., a nurse attempted to take his vital signs at which time he stated, "you better not talk to me, you're not supposed to talk to me, don't talk to me." (*Id.* at 649-50.) By 10:25 a.m., Mayweather-Brown demanded another nurse. (*Id.* at 650.) He was verbally abusive to the nurse and told her not to touch him or talk to him. (*Id.*) At 10:30 a.m., Mayweather-Brown continued to be verbally aggressive and called a jail officer a "f****** idiot." (*Id.*) He next told jail officer officers that he had a right to put his hands on them if he felt threatened. (*Id.* at 650.) Mayweather-Brown was removed from the restraint chair and mental health staff overheard him say that he was not suicidal and should be cleared from suicide watch. (*Id.* at 648.) At 12:10 p.m., he told jail officers he was not going to hurt himself. (*Id.*) They gave him back his property and a new shirt because he had ripped the one, he was wearing. (*Id.*)

On July 20, 2015, Yoder met with Mayweather-Brown on suicide watch and documented that the previous day's incident was like other incidents where he escalated conflict with jail officers. (ECF 212-3 at 652-53.) Yoder released him from suicide watch and placed him in the mental house housing unit. (*Id.*)

The next day, on July 21, 2015, Yoder stated that Mayweather-Brown's behavior was not indicative of a suicidal tendency but instead was strictly behavioral. (ECF 212-3 at 654.) Yoder noted he took great joy and pride in proving that he could get out of the restraint chair stating that "they couldn't control me in super max and you can't control me either." (*Id.*) Yoder also noted Mayweather-Brown's statement that "I have been waiting for you to go after me. I intend to make your lives miserable, and you will have to constantly deal with me from here on out." (*Id.*) Here, Yoder indicated that he would continue to instigate episodes with staff, and he enjoyed the constant attention." (*Id.* at 654.)

At 11:10 a.m. on July 22, 2015, Mayweather-Brown was placed in the restraint chair because of his aggressive behavior and verbal threats. (ECF 212-3 at 660.) In this regard, he stated to one jail officer that "I've already got [ten] lawsuits goin' against you." (*Id.* at 660.) Mayweather-Brown was offered medical attention every fifteen minutes, but he refused it. (*Id.* at 157, 159, 660). At 1:25 p.m., a nurse offered him water and he responded "no, f*** you!" (*Id.* at 656, 661.) Yoder followed-up with Mayweather-Brown on suicide watch and noted that, given his persistent pattern of hostility, Dr. Mathew would need to evaluate whether he could be released from suicide watch. (*Id.* at 663.)

The next day, on July 23, 2015, Mayweather-Brown met with Dr. Mathew and Brown. (ECF 212-3 at 667). Mayweather-Brown requested the meeting because he wanted a treatment plan that would help him. (*Id*.) Mayweather-Brown explained that he had an anger addiction as a youth and that it worked for him in most settings. (*Id*.) He stated his anger stems from being denied those things for which he has an entitlement. (*Id*.) He described becoming angry when he is ignored and when others are not accountable for their actions. (*Id*.) Mayweather-Brown said he is not suicidal and does not want to die. (*Id*.) He indicated he is a person who is popular and considered to be a leader. (*Id*.) Mayweather-Brown explained that he wanted counseling to "know [himself] better. (*Id*.) He mentioned that a counselor should stand up for what is right and take a stand for him when he is right. (*Id*.) Mayweather-Brown felt he want to change the system because he had been treated unfairly and believed a "good counselor" would help him do that. (*Id*.)

That same day, Dr. Mathew recommended that Mayweather-Brown be housed separately—and not with his peers—because of the risk of conflict. (ECF 212-3 at 672.) He noted that there was no environment that would be completely safe for him and he was determined to harm himself and then blame jail officers. (*Id*.) Dr Mathew did not believe that a restraint chair or padded cell would be any safer than his current cell, but physical intervention from jail officers increased the risk of harm to Mayweather-Brown and the jail staff. (*Id*.) He recommended a hands-off approach to treatment and noted Mayweather-Brown's prognosis was quite poor. (*Id*.) Dr. Mathew further indicated that

he should have mental health worker visits to be "listened to" during which he can discuss his issues. (*Id.*)

On July 23, 2015, Dr. Mathew also met with Perry to establish a hands-off approach to manage Mayweather-Brown for his own safety, and for the safety of jail officers and healthcare staff. (ECF 212-5 at ¶ 11.) The hands-off approach was not created to allow Mayweather-Brown to harm himself. (*Id.*) To the contrary, Dr. Mathew decided on this hands-off approach by analyzing his past behavior and determining that his behavior escalated any time medical and jail staff tried to intervene or tried to control his environment. (*Id.*) Dr. Mathew determined that a hands-off approach was best because he thought it would be the best way to prevent Mayweather-Brown from attempting to harm himself or harming others. (*Id.*)

At 11:42 a.m. on July 23, 2015, Mayweather-Brown threatened to start "hitting his head on the wall." (ECF 212-3 at 665-66.) Jail officers were able to observe what he was doing through the camera in his cell and saw him cover the window of his cell with paper and his sleeping mat. (*Id.*) At 12:30 p.m., he called for medical staff and when Nurse Emery responded, he threw a large cup of water on her. (*Id.* at 664-65.) Nurse Emery asked him if he needed medical attention and he responded "No, I don't. Get away from me." (*Id.*) At 9:41 p.m., he asked for Tylenol because his back was hurting. (*Id.* at 665.)

On July 24, 2015, Mayweather-Brown was released from suicide watch. (ECF 212-3 at 685.) Yoder released him based on Dr. Mathew's new treatment protocol. (*Id.*) At 12:15 p.m., he broke the light fixture in his cell, held up a piece of glass to the nurse, and

stated "I'm going to swallow this." (*Id.* at 689-90.) The nurse asked Mayweather-Brown to repeat himself, but he simply smiled and walked away. (*Id.*) He was then moved to another cell for his own safety. (*Id.*) At 2:00 p.m., Mayweather-Brown refused medical treatment for a small cut to his wrist and told the nurse "I don't want you to treat this, just want you to document." (*Id.* at 688.) At 3:50 p.m., jail officers were told he had swallowed glass, but one officer told the nursing staff to disregard the alleged incident because he did not have any glass in his cell. (*Id.* at 689.)

Two days later, on July 26, 2015, at 12:00 p.m., Mayweather-Brown told Nurse Elizabeth Rodriguez "Don't come near me, I will spray you, I will spray anyone that comes near me!" (ECF 212-3 at 692.) Nurse Rodriguez observed him waving a plastic container with urine. (*Id.*) At 1:00 p.m., Nurse Rodriguez witnessed him throw a cup of urine at a jail officer. (*Id.*)

On July 31, 2015, Yoder documented that Mayweather-Brown was permanently housed in the booking unit and was permitted to be out of his cell one hour a day, but he must be accompanied by jail officer. (ECF 212-3 at 701.) Due to this arrangement, he had had fewer episodes of conflict and had not acted out for a week. (*Id.*)

On August 5, 2015, Mayweather-Brown refused to take Clonidine. (ECF 212-3 at 707.) At 12:30 p.m., he was escorted to the medical unit for a breathing treatment because he was wheezing and had shortness of breath. (*Id.* at 709.) Dr. Foster ordered Prednisone (anti-inflammatory medication). (*Id.*) At 1:10 p.m., a nurse responded to a report that Mayweather-Brown cut his arm with glass he found in his cell. (*Id.* at 714.) Nurse Emery examined his arm and found four superficial abrasions on his inner right

forearm. (*Id.*) She cleaned and bandaged his arm and then he stated, "pretty soon, it's gonna be my neck." (sic) (*Id.*) Mayweather-Brown was placed on suicide watch, but he had to stay in his cell and jail officials checked him every fifteen minutes. (*Id.* at 712-15.) At 2:50 p.m., he asked medical staff to retrieve the glass fragments from his cell. (*Id.* at 715.) A nurse arrived and Mayweather-Brown handed her five small glass fragments. (*Id.*)

The next day, on August 6, 2015, Brown followed up with Mayweather-Brown on suicide watch. (ECF 212-3 at 716-18.) He denied any suicidal ideation or plan and talked about the injustices of his treatment by jail staff. (*Id.* at 717.) He indicated that mental health staff needed to train jail officers on the proper way to treat him. (*Id.*) He became irritated when Brown told him that she could not serve as an advocate for those things he thought he deserved but instead she could listen to him. (*Id.*) Brown noted that his risk for suicide was low. (*Id.*)

On August 7, 2015, Mayweather-Brown told Brown that he did not need to be on suicide watch. (ECF 212-3 at 721.) She noted that he had been calm and stable for about thirty-six hours. (*Id.*) At 1:30 p.m., Brown released Mayweather-Brown from suicide watch. (*Id.* at 722.)

Three days later, on August 10, 2015, Mayweather-Brown refused to take his Clonidine. (ECF 212-3 at 725.) At 12:10 p.m., it was reported that he had something tied around his neck. (*Id.* at 726.) Brown arrived at his cell and observed him sitting under a blanket. (*Id.*) Jail officers entered the cell and Brown could see that he was holding a piece of fabric from his mattress cover. (*Id.*) Mayweather-Brown stated that he was

angry because he did not have a haircut and had not had access to the law library. (*Id.*) He then placed the strip of fabric around his neck and refused to give the strip of fabric to jail staff. (*Id.*) They decided to leave Mayweather-Brown in his cell and closely observed him. (*Id.*) Brown reasoned that his behavior was related to his placement in administrative segregation where he had fewer privileges. (*Id.*) He later backed off from his self-harm behaviors. (*Id.*) At 3:10 p.m., Mayweather-Brown reported that he had cut himself with glass. (*Id.* at 728.) A nurse arrived and cleaned and bandaged two to three of his superficial abrasions on his inner left wrist. (*Id.*) He would not surrender the piece of glass he used to harm himself. (*Id.*)

On August 11, 2015, Mayweather-Brown asked to speak with Brown. (ECF 212-3 at 729.) They discussed his behavior on August 10, 2015, and he said he was angry, but he was not contemplating death or dying. (*Id.* at 729.) Mayweather-Brown told Brown that the mental health staff was responsible for changing the jail's policies and procedures. (*Id.*) Brown responded that her job was to help him change his behaviors even though he was not interested in changing those behaviors. (*Id.*) He said that he needed special accommodations to deal with his P.T.S.D. and then he became verbally abusive to Brown, calling her a "b****." (*Id.*) Brown ended the session with him and he said he was going to kill himself as staff left his cell. (*Id.*) Jail officers subsequently checked on him frequently. (*Id.*)

Three days later, on August 14, 2014, Mayweather-Brown said he no longer wanted to talk with the mental health staff. (ECF 212-3 at 734.) He admitted he made suicidal statements or gestures when he got angry. (*Id.*) Brown noted that he would

remain housed in a cell with a camera in the booking unit and items he used to harm himself would routinely be taken from his cell when he showered. (*Id.*) At 2:42 p.m., Mayweather-Brown once again announced that he intended to kill himself. (*Id.* at 736.) He ripped the top of his uniform and stated he was going to hang himself. (*Id.*) He apparently was upset because he did not get his allotted time in the law library that day. (*Id.*) At 3:15 p.m., Brown placed him on level-three suicide watch. (*Id.*) Nurse Emery recommended that he be checked every fifteen minutes because he covered the window and camera in his cell. (*Id.*) At 4:30 p.m., Mayweather-Brown relinquished the ripped piece of fabric to jail officials. (*Id.*) Brown recommended he remain on level-three suicide watch and he could not use while on suicide watch. (*Id.*)

On August 17, 2015, Yoder met Mayweather-Brown on suicide watch. (ECF 212-3 at 739-40.) He admitted he was angry that he could not go to the law library. (*Id.*) Four days later, on August 21, 2015, Yoder met with Mayweather-Brown again and noted he had no significant change in his presentation. (*Id.* at 747-48.) Yoder noted that he voiced his concern about his rights not being honored by jail officers. (*Id.* at 748.) He exhibited rage and a tremendous sense of entitlement. (*Id.*) Mayweather-Brown reiterated that the jail officers "trigger[ed his] P.T.S.D." (*Id.*)

On August 24, 2015, Yoder followed up with Mayweather-Brown, who was extremely hostile because he thought that mental health staff was giving into the jail officer's expectations. (ECF 212-3 at 750.) He yelled at Yoder for not doing a "damn thing." (*Id.*) He was further angered by the fact that the mental health staff no longer opened the door when they spoke with him. (*Id.*)

A day later, on August 25, 2015, Dr. Mathew met with Mayweather-Brown, who was angry because he would not open the door to speak with him. (ECF 212-3 at 751-53.) Mayweather-Brown yelled at Dr. Mathew during most of their visit, and stated he was being abused by jail officers, which worsened his P.T.S.D. (*Id.* at 751.) He refused to talk about medication and stated he wanted to be treated like everyone else. (*Id.*) Dr. Mathew noted that Mayweather-Brown had no insight into his behavior, had a sense of entitlement, and was demanding. (*Id.*) He said he would subpoena Dr. Matthew and would sue many jail officers for his ineffective treatment. (*Id.*) Dr. Mathew had no new treatment recommendations. (*Id.* at 753.)

Between September 1, 2015 and September 30, 2015, Mayweather-Brown was periodically in and out of the Elkhart Jail. (ECF 212-3 at 770.)

On September 1, 2015, Mayweather-Brown assaulted a jail officer by knocking him to the ground and gaining control of his taser. (ECF 212-3 at 776-77.) Another jail officer wrestled the taser away from Mayweather-Brown and then subdued him. (*Id.*) After he was returned to his cell, he began yelling that he had back pain and needed medical attention. (*Id.*) Dr. Foster saw Mayweather-Brown belligerently kicking and pounding on the door of his cell. (*Id.*) Mayweather-Brown recounted the incident with a nurse expressing the pride he felt when he assaulted the officer and then threatened more violence. (*Id.*) Dr. Foster's opined that his back pain did not constitute a serious medical condition and his prescribed Tylenol was adequate to alleviate his pain. (*Id.*) The next day, on September 2, 2015, he complained to mental health staff that jail

officers characterized him as being dangerous; however, they had no evidence to support their claim. (*Id.* at 778.)

At the beginning of September 2015, Mayweather-Brown refused to take his medication. For example, on September 3, 2015, he would not take his morning medication because he was "being lazy." (ECF 212-3 at 780.) On September 7, 2015, Mr. Mayweather-Brown refused his morning asthma medications. (*Id.* at 786.)

On September 11, 2015, mental health staff discussed Mayweather-Brown's memory about his past emotional feelings and his inability to capture those feelings in the present. (ECF 212-3 at 792.) He then asked, "does that mean I'm a sociopath?" (*Id.*) Three days later, on September 14, 2015, he once again refused his evening asthma medications, stating that he did not want to be harassed. (*Id.* at 801.)

On September 15, 2015, at 4:40 p.m., Mayweather-Brown told jail officers that he was going to hang himself because he wanted to be out of his cell more often and at different times of the day. (ECF 212-3 at 802.) Dr. Mathew recommended close observation, but that staff should remain as hands-off as possible so as not to escalate the situation. (*Id.*) At 7:45 p.m., the nursing staff was advised that Mayweather-Brown wanted to cut his head off. (*Id.* at 805.) He was then placed on observation. (*Id.*)

The next day, on September 16, 2015, at 3:45 a.m., Mayweather-Brown was given his morning inhaler. (ECF 212-3 at 812.) He took the inhaler, held it for a second, and then handed it back to the nurse. (*Id.*) Yoder followed up with him about his recent suicide threats. (*Id.* at 806-807.) He told Yoder that he "just gets pissed off sometimes." (*Id.*) Yoder noted that Mayweather-Brown was angry over a decision regarding his jail

time. (*Id.* at 807.) He noted that the primary incident that month entailed his physical assault on a rookie jail officer, after which the nursing and mental health staff were not permitted to be in the same room with him without a jail officer. (*Id.* at 808.) He assumed responsibility for the incident and spent his time complaining. (*Id.*) At 10:30 p.m., Mayweather-Brown reported to the medical unit for his evening medications. (*Id.* at 814.) He did not seal his lips around the inhaler and talked during his nebulizer treatment. (*Id.*)

On September 17, 2015, Mayweather-Brown refused to use his morning inhaler. (ECF 212-3 at 817.) At 1:00 p.m., Nurse Emery educated him on the proper use of inhalers and nebulizer treatment as well as the potential complications of incorrect use of these devices. (*Id.*) Mayweather-Brown responded that "I've been an asthmatic for [twenty years], I know how to use an inhaler." (*Id.*) At 10:15 p.m., a nurse noticed that Mayweather-Brown was complaining of chest pain. (*Id.* at 818-19.) He was examined and given acid reflux medication, which he refused to take. (*Id.* at 818-19, 821.) About a week later, on September 23, 2015, he again refused to take his morning medications. (*Id.* at 822.)

On October 3, 2015, Mayweather-Brown was given his evening inhaler. (ECF 212-3 at 847.) He put the inhaler in his mouth but did not push the button. (*Id.*) The nurse asked him if he had used the inhaler and he responded, "Yes ma'am." (*Id.*)

Two days later, on October 5, 2015, Dr. Mathew met with Mayweather-Brown and noted he maintained his usual tirade about being treated differently. (ECF 212-3 at 862-64.) He requested additional time to talk with mental health staff and Dr. Mathew

counseled him on how to best use his time with mental health. (*Id.* at 864.) He then became angry and defensive and Dr. Mathew ended the meeting. (*Id.*)

On October 8, 2015, Mayweather-Brown took his evening medication. (ECF 212-3 at 865.) He then walked to the back of his cell, threatened Lieutenant Cole and stated "[c]ome get them, I'm not taking them." Two days later, on October 10, 2015, he hit his head on his bunk. (Id. at 878-79.) A nurse later observed a small laceration on his head. (*Id.*)

On October 12, 2015, at 3:20 a.m., Mayweather-Brown refused his medications because he was upset that no treatment was ordered for his head injury. (ECF 212-3 at 882.) The nurse recounted Dr. Foster's instructions that he take Tylenol as needed and keep the area clean and dry. (*Id.*) Mayweather-Brown responded that "you guys are all incompetent and stupid. None of you do your job. I am going to get [an] infection in the spot on my head. I am filing a grievance on all of you." (*Id.* at 884.) The nurse asked him if he would like to fill out a form to see the doctor, and he replied, "That doctor is stupid as h***." (*Id.*) At 8:30 a.m., Mayweather-Brown told one of the nurses that he was upset because he had not been scheduled for an emergency visit to see a doctor after he hit his head. (*Id.* at 884.) He then threatened to "call the medical board and the nursing board." (*Id.*) The nurse examined his head and found no break in the skin, no redness, and no swelling. (*Id.*) She asked him what treatment he wanted for his head and he stated, "you are all incompetent." (*Id.*) A few days later, on October 15, 2015, Dr. Foster attempted to examine Mayweather-Brown's head, but he refused the examination. (*Id.*

at 887.) Next, on October 16, 2015, Yoder met with Mayweather-Brown and noted he had not had any recent outbursts. (*Id*. at 888-89.)

On October 22, 2015, at 5:30 p.m., Mayweather-Brown again announced that he intended to kill himself. (ECF 212-3 at 895.) At the time, he was holding a piece of torn cloth in his hands. (*Id*.) Per Dr. Mathew's instructions, Yoder indicated that he should not be placed on suicide watch. (*Id*. at 896.) At 10:15 p.m., the nursing staff was contacted because jail officers had used pepper spray on Mayweather-Brown. (*Id*. at. 897.) When nurses arrived, he refused to allow officers to handcuff him stating "it is medicals duty to treat me and since the officers decided to do this to me, they have to follow through with it and get me out so I can be treated. They can't just leave me in here." (*Id*. at 899.) He then shouted "Cole f***** up when he sprayed me. They should have to come in here and get me." (*Id*. at 897.) The nurse noted that Mayweather-Brown was standing at the door of his cell and was exhibiting no signs of distress. (*Id*. at 899.) The nurse told him that until he allowed jail officers to handcuff him, he could not be treated. (*Id*.) At 10:52 p.m., Mayweather-Brown stated that he was busy trying to hang himself. (*Id*. at 899.) He had also once again covered the window and camera in his cell. (*Id*.)

Toward the end of October 2015, Mayweather-Brown once again refused to take his medications. (ECF 212-3 at 900, 902, 904.) On October 28, 2015, between 11:45 a.m., and 4:45 p.m., he was in and out of the restraint chair and was able to break out of it multiple times. (*Id*. at 905, 914, 919.) He also refused medical care. (*Id*. at 905, 906-913.) At 10:05 a.m., Mayweather-Brown stated that he was bleeding and required medical

care. (*Id.* at 920.) Nurse Emery noted he had two superficial lacerations to his inner left wrist. (*Id.*) However, Mayweather-Brown was verbally threatening and declined medical treatment after he had requested it. (*Id.*) He eventually allowed a nurse to clean and bandage his lacerations. (*Id.*) At 7:30 p.m., a nurse was called to his cell to attend to another cut he had made to his arm. (*Id.* at 917.) Mayweather-Brown had tied a rag around his arm to make the veins pop out and then had made a small cut to his wrist with a paper clip. (*Id.*) The nurse removed the rag, cleaned the wound, and applied a bandage. (*Id.*)

On October 29, 2015, at 4:00 a.m., Mayweather-Brown was given his morning asthma inhaler. (ECF 212-3 at 930-31.) He took the inhaler, threw it to the back of his cell, and stated "come and get it now." (*Id.* at 930.) The jail officer was able to talk him into giving back the inhaler. (*Id.*) At 2:30 p.m., Mayweather-Brown refused medical treatment for the superficial wound on his left wrist, stating "I'm gonna call you when it's bad enough." (*Id.* at 925.) He was attempting to hurt his wrist using the sink. (*Id.* at 903.) Jail officers informed the nurse staffing that he would not open his cell unless he needed stitches or urgent medical care. (*Id.*) At 2:45 p.m., Mayweather-Brown again informed the medical staff that he was bleeding, and the nurse observed a small, superficial laceration to his inner left wrist. (*Id.*) Five minutes later, at 2:50 p.m., he would not allow Dr. Foster to look at the wound to his left wrist and stated, "I'm taking care of it." (*Id.* at 926, 930.) Dr. Mathew then placed Mayweather-Brown on suicide watch. (*Id.* at 927-928, 930.)

At 3:35 p.m. on October 29, 2015, Mayweather-Brown refused medical care for the wounds to his wrist, and stated "I'm not done, so they don't need [to be] cleaned yet." (ECF 212-3 at 923.) He requested to be seen by the nurse in twenty minutes. (*Id.* at 930.) By 4:00 p.m., medical staff was called to assess his wrist, but he refused medical care stating that "Corey lied to me." (*Id.* at 924.) At 4:30 p.m., Mayweather-Brown allowed the nurse to clean the wound to his left inner wrist. (*Id.* at 930.) The nurse observed a small, superficial laceration with a minimal amount of dried blood. (*Id.*) Mayweather-Brown refused a bandage and stated that he may or may not attempt to hurt himself again. (*Id.*)

On October 30, 2015, Dr. Mathew met with Mayweather-Brown due to his escalating behavior. (ECF 212-3 at 934-36.) Dr. Mathew reported that he had pushed boundaries, been inappropriate with jail staff, and had more restrictions. (*Id.* at 934.) Because he had more restrictions, Mayweather-Brown's threats of suicide and self-harm had escalated. (*Id.*) He had also been placed in the restraint chair a few times and had chewed his way out. (*Id.*) Dr. Mathew opined that his behavior was highly predictable, and he harmed himself so that he could make a case for being neglected. (*Id.*) When attempts were made to treat or protect Mayweather-Brown, he immediately sabotaged them. (*Id.*) Because Mayweather-Brown escalated his behavior during the meeting, Dr. Mathew ended the meeting early, which prompted him to threaten to hang himself. (*Id.*) Dr. Mathew noted that he should not evaluate Mayweather-Brown when his behavior had escalated because it led to more adverse behavior. (*Id.* at 936.) Dr.

Mathew recommended consistency and not engaging in arguments with Mayweather-Brown. (*Id.*)

Yoder followed up with Mayweather-Brown on suicide watch. (ECF 212-3 at 939-40.) When he saw her, he stated "Yoder, you're a f****** b****. Get the hell away from my door." (*Id.* at 940.) Yoder noted that he was unable to garnish any support from Dr. Mathew and his motivation for clinical support was poor. (*Id.*) At 1:05 p.m., he refused medical care, stating "f*** you bitch. Don't open my door. Go away." (*Id.* at 932.) By 2:03 p.m., Mayweather-Brown asked to speak with the medical staff. (*Id.*) Nurse Emery arrived at his cell to speak with him to which he responded "f*** you, get away from my door." (*Id.*)

On October 31, 2015, at 1:00 p.m., Mayweather-Brown attempted to hang himself on the bar next to his toilet. (ECF 212-3 at 948.) Jail officers discovered him and tore away the cloth that he had tied around his neck. (*Id.*) Mayweather-Brown was coughing and hyperventilating but his vital signs were stable. (*Id.*) There were no abrasions, indentations, discoloration, or swelling on his neck. (*Id.*) Jail officers took his belongings and clothing for his safety, which caused him to become irate. (*Id.*) At 2:10 p.m., he asked to speak to the nursing staff. (*Id.* at 951.) Mayweather-Brown was irate and stated, "that mother f***** over there just watch[ed] me rip this cloth to hang myself and he just smiled." (*Id.*) He further stated, "Gary Yoder does nothing for me, I am receiving no mental health from you at all." (*Id.*) The nurse informed him that if he continued to yell, she would walk away, and he responded that the nurse could walk away. (*Id.*)

At 4:20 p.m. on October 31, 2015, Mayweather-Brown was placed in the restraint chair after he made numerous attempts at hurting himself. (*Id.* at 944, 946, 953.) At 10:30 p.m., the nurse gave him his medication and water and juice to drink. (*Id.* at 953.) He told the nurse that he only wanted enough water to keep his lips moist because he intended to be in the restraint chair until Monday and he did not want to drink too much water because he did not want to have to get out of the chair to use the bathroom. (*Id.*) He did not state why he wanted to remain in the restraint chair. (*Id.*)

On November 1, 2015, just after midnight, Mayweather-Brown was released from the restraint chair and given food, Boost, and juice. (ECF 212-3 at 954-55.) He returned to his cell with his suicide smock and stated, "I just want to sleep now." (*Id.* at 955.) At 4:50 p.m., jail officers once again placed Mayweather-Brown in the restraint chair. (*Id.* at 966-67.) At that time, he stated he did not want his vital signs checked every fifteen minutes and he agreed to sign a refusal of treatment form. (*Id.* at 964, 967.) Mayweather-Brown then urinated on himself. (*Id.* at 967.)

On November 2, 2015, Mayweather-Brown requested medical care because he had chest pain but refused to allow the nurse to examine him. (ECF 212-3 at 970, 981.) At 9:00 a.m., jail officers contacted the nursing staff and reported that he had eaten a tube of tooth paste (2.75 grams) because "it was the right thing to do." (*Id.* at 975.) At 9:24 a.m., a nurse observed Mayweather-Brown in his cell eating another tube of toothpaste. (*Id.* at 978.) The nurse then contacted poison control who told her he may vomit due to ingesting the toothpaste. (*Id.*) Dr. Foster ordered the nursing staff to monitor Mayweather-Brown for vomiting. (*Id.* at 975.) Yoder met with him and noted

he was agitated and hostile. (*Id.* at 982-83.) He also noted that Mayweather-Brown's behavior was attention-seeking and he had no insight into his own actions. (*Id.*) At 5:10 p.m., he requested a Boost supplement and antacid tablets. (*Id.* at 975.) He was given both, but he refused the Boost. (*Id.*) At 5:20 p.m., jail officers convinced him to drink the Boost and request a meal tray. (*Id.*)

The next day, on November 3, 2015, Mayweather-Brown refused his morning asthma medication. (ECF 212-3 at 987.) At 10:45 a.m., he reported that he was no longer going to drink any fluids and his reason was "because he wants to." (*Id.* at 993.) At 12:20 p.m., the nursing staff was called because he cut his wrist with a small piece of plastic. (*Id.*) The nurse observed the cut to be superficial and only slightly bleeding. (*Id.*) He refused to allow the nurse to dress the cut, saying "get away from my f****** door." (*Id.* at 988, 993.) Mayweather-Brown threatened to harm anyone who opened his cell door. (*Id.* at 993.) Jail officers told the nursing staff that they were planning to remove him from his cell and confiscate the items he was using to harm himself. (*Id.*) Yoder met with Mayweather-Brown and observed that he was agitated, hostile, and unable to accept the consequences of his actions. (*Id.* 989-90.) He further noted that Mayweather-Brown's "ability to cope is non-existent." (*Id.* at 990.) Yoder noted that a meeting with Perry, the second shift sergeant, and Dr. Mathew was needed and there "must be a line of sight for Mayweather[-Brown] at all times." (*Id.*) At the meeting, it was suggested that he be given paper clothes to lessen the risk of self-harm. (*Id.*)

On November 4, 2015, Yoder met with Mayweather-Brown. (ECF 212-3 at 995.) He noted that he planned on meeting with Mayweather-Brown several times per week

to allow him to vent. (*Id*.) The next day, on November 5, 2015, Yoder followed up again with Mayweather-Brown and noted that he was focused on being released from suicide watch. (*Id*. at 1001.) At that time, Dr. Mathew consulted with Dr. Dalmasy, the chief psychiatrist at CCS, to review Mayweather-Brown's recent behavior and treatment approaches. (*Id*. at 1002-03.) Dr. Dalmasy acknowledged the high level of risk that Mayweather-Brown presented at the jail, regardless of his treatment, and he expressed his agreement with Dr. Mathew's treatment plan for Mayweather-Brown. (*Id*. at 1002.) Dr. Mathew and Dr. Dalmasy felt that Mayweather-Brown did not have a psychotic disorder, and that his symptoms were consistent with antisocial personality and impulse control disorders. (*Id*.) After consulting with Dr. Dalmasy, Dr. Mathew's treatment plan entailed: (1) reducing physical interventions, (2) using the restraint chair when Mayweather-Brown engaged in self-harm, but not when he made threats or isolated gestures, (3) taking items out of his cell since he used anything he could find to harm himself, and (4) increasing meetings with mental health staff. (*Id*. at 1003.) Also, at 5:45 p.m., on November 5, 2015, Mayweather-Brown received a breathing treatment and told the nurse he wanted to be released from level-three suicide watch and said, "I am gonna sue all of medical for keeping me on this level-three protocol." (*Id*. at 1005.)

On November 6, 2015, Mayweather-Brown refused his morning medication. (ECF 212-3 at 1006.) At 10:45 p.m., he bragged about eating toothpaste, stating that he had eaten six tubes. (*Id*. at 1007.) The next day, on November 7, 2015, Mayweather-Brown refused to take his evening medication. (*Id* at 1010.)

Two days later, on November 9, 2015, Mayweather-Brown saw the dentist to have a tooth repaired. (ECF 212-3 at 1016-18.) The dentist noted that he may have feigned tooth pain to have his tooth restored. (*Id.* at 1018.) Yoder met with Mayweather-Brown, who stated he was unjustly placed on suicide watch. (*Id.* at 1020.) The next day, on November 10, 2015, Yoder attempted to follow up with Mayweather-Brown but refused to meet with Yoder, saying "Yoder, I have absolutely nothing to say to you." (*Id.* at 1024.)

On November 11, 2015, at 8:00 a.m., Mayweather-Brown asked to meet with the mental health staff. (ECF 212-3 at 1032.) He told them "this watch [wa]s no longer necessary" and threatened them, saying "[m]y sister on the outside won't take kindly to the way I am being treated. Trust me, you will lose your license." (*Id.* at 1032.) At 11:22 a.m., Mayweather-Brown began yelling for a nurse and told her that he was "fittin' to tie this thing around my neck if I don't see mental health." (*Id.*) Yoder then met with him. (*Id.* at 1029-30.) Mayweather-Brown told Yoder that he would be calling mental health staff constantly to attempt to get off of suicide watch. (*Id.* at 1030.) Yoder made it clear that he would spend thirty minutes with him each day and Mayweather-Brown responded "you just wait. I'll make certain your coming to me all day long." (*Id.*)

The next day, on November 12, 2015, Yoder met Mayweather-Brown on suicide watch. (ECF 212-3 at 1033-34.) He told Yoder to "get the f*** away from this door. You don't give a damn." (*Id.* at 1034.) At 9:16 a.m., Mayweather-Brown asked for his inhaler. (*Id.* 1037-38.) After using the inhaler, he threw it on his bunk and stated, "now you can

bring your team in and get the mother f*****." (*Id.* at 1038.) The next day, he once again refused his morning medication. (*Id.* at 1040.)

On November 16, 2015, Yoder authored a behavioral health note detailing that Dr. Mathew did not see a need to remove Mayweather-Brown from suicide watch. (ECF 212-3 at 1051-53.) Yoder noted that Mayweather-Brown constantly demanded to be taken off suicide watch. (*Id.* at 1051.) Yoder met him and he stated "Yoder, get the f*** away from my cell, you don't know s*** and you're a** is fired. I have no plan to talk to you until you have your meeting." (*Id.* at 1055.)

On November 18, 2015, Yoder attempted to meet with Mayweather-Brown but he refused to talk with him. (ECF 212-3 at 1071.) He stated "Gary, get lost. You know I don't want to talk to you if you aren't getting me off level [three]." *Id.* The next day, on November 19, 2015, Yoder attempted to meet with Mayweather-Brown, who stated "Yoder, unless I'm off suicide watch, get the hell out of here. You don't know s***." (*Id.* at 1076.)

On November 20, 2015, Mayweather-Brown asked to be transferred to another facility. (ECF 212-3 at 1079, 1082.) The judge agreed to transfer him to the Lake County Jail. (*Id.*) Yoder spoke with Mayweather-Brown about the transfer, who responded "I'm getting the h*** out of here, no thanks to you Yoder." (*Id.* at 1082.) About three weeks later, on December 11, 2015, Mayweather-Brown returned to the Elkhart Jail. (*Id.* at 1092.)

On December 30, 2015, Yoder noted that since his trial and guilty sentence, Mayweather-Brown's behavior had not been problematic. (ECF 212-3 at 1113.) He

exhibited no conflicts with his peers or jail officers and had been placed in the mental health unit. (*Id.*)

On January 1, 2016, Mayweather-Brown requested a breathing treatment. (ECF 212-3 1122-23.) The nurse informed him that he would do the breathing treatment in a classroom in his unit instead of in the medical unit and he responded "you don't know what you are talking about, shut up." (*Id.*) He then began insulting jail officers and the nurse. (*Id.*) After being belligerence with the officers, they decided to take him to the medical unit, where he did his breathing treatment without issue. (*Id.*)

On January 4, 2016, Mayweather-Brown refused to take his morning medication. (ECF 212-3 at 1124.) At 9:45 p.m., nursing staff set up a nebulizer breathing treatment for him in a classroom in his unit. (*Id.* at 1128.) He responded by unplugging the nebulizer machine, moving it to the other side of the room, and saying "I told them that if I had to take my treatments down here that I would break the machine. I'm going to break this f****** machine now. No, I will not give it back to you." (*Id.*) He was then confronted by jail officers and a physical altercation ensued during which he scratched and spit at officers. (*Id.* at 1128, 1130.) After the physical altercation. he made suicidal statements. (*Id.* at 1128.) Mayweather-Brown was placed on level-two suicide watch. (*Id.* at 1126.) He refused his evening medications and stated to the nurse "I don't want to see you b****. If you come by my door again, I'll piss on you. I w[ant] a different nurse. Come by my door against and I'll piss on you b****." (*Id.* at 1125, 1128.) He further stated "If you sign a refusal, I'll go to the nursing board and take your license and I'll have my family come after you too. You're going to get sued b****." *Id.*

The next day, on January 5, 2016, Dr. Mathew met with Mayweather-Brown. (ECF 212-3 at 1130.) He noted Mayweather-Brown had been doing well until he threw a fit the day before. (*Id.*) Dr. Mathew recounted that he seemed to be scared when he was in his housing unit and acting out may have been a way for him to return to a cell in the booking unit. (*Id.*) He considered placing Mayweather-Brown on level-three suicide watch, but with paper scrubs so he could not make his typical self-harm gestures. (*Id.* at 1132.) Ultimately, Dr. Mathew decided to keep him on a level-two suicide watch. (*Id.* at 1136.)

On January 8, 2016, Mr. Mayweather-Brown remained on level-two suicide watch and Perry decided to give him a mattress. (ECF 212-3 at 1165.)

On January 12, 2016, Mayweather-Brown asked to speak with the nursing staff. (ECF 212-3 at 1181.) Nurse Emery reported that he was agitated and raised his voice with another nurse because he did not want to remain on suicide watch. (*Id.*) He was upset because he had a cold and wanted to schedule an urgent appointment with the doctor. (*Id.* at 1183.) He stated that he would "have . . . . Robin's license, Dr. Foster's license and Gary's license. (*Id.* at 1181.) Mayweather-Brown said that if he remained on suicide watch, he would "make everyone's lives hell for the next [seven] days." (*Id.* at 1181, 1183.)

On January 13, 2016, Mayweather-Brown refused to take his morning medication. (ECF 212-3 at 1187.) About a week later, on January 21, 2016, Mayweather-Brown was transferred to an IDOC facility. (ECF 212-2 at ¶ 5.)

<u>PRELIMINARY MOTIONS</u>

Before the court addresses the merits of the parties' summary judgment motions, several motions filed by Mayweather-Brown must be addressed.

Mayweather-Brown has filed a motion to strike (ECF 271) a portion of the defendants' briefs and evidence – specifically, arguments and records that suggest that Mayweather-Brown suffered from a behavior problem instead of a mental health problem. It is the function of the Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement.  See, e.g., *S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 392 (S.D.N.Y. 2006); *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, No. 04 C 5167, 05 C 2253, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, No. 03 C 2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F.Supp.2d 917, 920 n.1 (N.D. Ind. 2004). Mayweather Brown's motion will be denied, but the court notes that, in ruling on a motion for summary judgment, the court considers only relevant evidence that would be admissible at trial. *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). The court is able to sift through the evidence and to consider each piece under the applicable federal rules, thus there is no need to address Mayweather-Brown's motion to strike and it will be denied.

Mayweather-Brown has filed several motions (ECF 277; 280; 287) seeking a preliminary ruling on the admissibility of documents. With these motions, Mayweather-Brown has presented a report from the Elkhart County Detention Center

regarding events occurring on January 27, 2014 (ECF 277 at 6); several documents obtained through a request for public records (ECF 280-1); and two reports concerning his competency to stand trial (ECF 287-1). It would be premature for the court to decide issues of admissibility at this juncture. Motions in limine should be filed after all dispositive motions have been ruled upon and a trial date has been set. Accordingly, the motions for determination of admissibility will be denied, but – in light of Mayweather-Brown's status as a *pro se* litigant, the documents have been considered in connection with the pending summary judgment motions. These motions (ECF 277; 280; 287) will be denied.

Mayweather-Brown filed two motions (ECF 278; 289) asking the court to take judicial notice of two cases: *Indiana Protection and Advocacy Services Commission v. Commissioner*, No. 1:08-cv-01317-TWP-MJD, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012); and *In re: the mental commitment of M.P.*, 510 N.E.2d 645 (Ind. 1986). A court may take judicial notice of adjudicative facts if they are generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201. The court has considered the cases that Mayweather-Brown presents, but it is not necessary to take judicial notice of the cases. These motions (ECF 278; 289) will be denied.

Mayweather-Brown filed a motion (ECF 279) asking the court to rule on his motion seeking judicial notice (ECF 278). While Mayweather-Brown's case is important, so are the other cases filed in this court. His case is not the only one before this court. It

takes time to accurately review and justly rule on each filing. Doing that is delayed by filing unnecessary motions like this one. Therefore, the motion (ECF 279) will be denied.

STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. The court will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's sole task in ruling on a motion for summary

judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable fact finder could find in favor of the nonmoving party, summary judgment may not be granted. *Id.* Nevertheless, a party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Furthermore, where the parties file cross-motions for summary judgment, the court must consider each motion; but despite the parties' agreement that no genuine dispute of material fact exists, the court can deny all motions if the parties do not establish their rights to judgment as a matter of law. *Grabach v. Evans*, 196 F. Supp. 2d 746, 747 (N.D. Ind. 2002).

ANALYSIS

*Inadequate Medical Care Claim*

Mayweather-Brown moves for summary judgment asserting that the Defendants violated his constitutional rights by allowing him to inflict harm upon himself while he was a pretrial detainee at the Elkhart Jail. (ECF 202 at 1.) He claims he was "gravely disabled" and "seriously mentally ill" while housed at the jail but was deprived of adequate mental health and medical care, which allowed him to repeatedly engage in acts of self-harm and suicide. (*Id.*) Mayweather-Brown claims there was a policy orchestrated by jail officials to deprive him of much needed medical care. (*Id.*) This policy caused him extreme psychological and emotional damage, and physical injuries during his incarceration at the jail. (*Id.*) He claims the Defendants worked in concert to

develop policies to provide him with substandard treatment and care. (*Id.* at 3.) Mayweather-Brown states that, when he complained he felt suicidal or wanted to harm himself, they would allow him to attempt to carry out his plan. (*Id.*) In other words, he states he was a danger to himself and the Defendants failed to protect him from himself. (*Id.*) Mayweather-Brown further asserts that he should have been placed in a state mental hospital, but the Defendants refused to do so. (*Id.* at 3-4.)

The Defendants have responded to Mayweather-Brown's motion for summary judgment by filing cross-motions for summary judgment in which they assert there are no genuine issues of material fact as to his alleged inadequate medical claim. (ECF 210; 213.) In this regard, the Defendants contend that Dr. Mathew spent a significant amount of time and effort developing and implementing an appropriate "hands-off" treatment plan for Mayweather-Brown with the goal of keeping him and all those around him safe. (ECF 211 at 2, 8-12.) They next assert that Yoder, a licensed clinical social worker, provided daily mental healthcare services to Mayweather-Brown by counseling him, monitoring his destructive behavior, and following Dr. Mathew's treatment plan to protect him. (*Id.* at 12-14.) They further claim that Yohn, the Health Services Administrator, was simply the office administrator and did not provide any care to Mayweather-Brown. (*Id.* at 6-8.) Finally, the Defendants contend that Lieutenant Bigler and Captain Perry reasonably relied on Dr. Mathew's treatment plan as well as the medical and treatment advice of the CCS staff to ensure that Mayweather-Brown's mental health needs were met. (ECF 214 at 8.)

Mayweather-Brown's constitutional rights "as a pretrial detainee are derived from the Due Process Clause of the Fourteenth Amendment." *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). "[M]edical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonable inquiry identified in *Kingsley*. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (citing *Kingsley v. Henderickson*, 135 S.Ct. 2466, 2472 (2015)). The inquiry for assessing a due process challenge to a pretrial detainee's medical care entails two steps. *Id*. at 353. The first step, which focuses on the intentional conduct of the defendants, "asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [the plaintiff's] case." *Id*. A showing of negligence or even gross negligence will not suffice. *Id*. The second step asks whether the challenged conduct was objectively reasonable. *Id*. at 354. This requires a court to "focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, (7th Cir. 2018). The objective reasonableness standard requires more than medical malpractice and "the state-of-mind-requirement for constitutional cases remains higher." *Miranda*, 900 F.3d at 353.

*Dr. Mathew*

With respect to Dr. Mathew, Mayweather-Brown argues that Dr. Mathew was the architect of the "hands-off" treatment plan implemented on July 23, 2015, which he specifically created to deny him adequate medical and mental health care at the Elkhart

Jail. (ECF 232-1 at 8.) He asserts that Dr. Mathew "took a one size fit[s] all approach" to his mental healthcare treatment "even when the result was a matter of life and death." (*Id*. at 39.) He states that Dr. Matthew failed to provide an "objective level of mental health evaluations and medication" that he believed were warranted. (*Id*.) Next, he claims that Dr. Mathews ignored the fact that he refused to take his medications because Dr. Mathew "did not care." (*Id*.) Mayweather-Brown found Dr. Mathew's treatment plan to be so "cursory" that it amounted to no treatment at all and simply constituted dangerous and "experimental" treatment which took a "gamble" on his life. (*Id*. at 40.) In sum, he claims that Dr. Mathew's "hands-off" treatment plan was unreasonable given his multiple suicide attempts and the fact that his condition did not improve. (*Id*. at 41.)

As a psychiatrist employed by CCS, Dr. Mathew's role within the Elkhart Jail health care system was to diagnose inmates with behavioral and psychiatric disorders, prescribe and manage psychiatric medication for inmates, and see inmates as needed for acute psychiatric issues. (ECF 212-5 ¶¶ 3, 4.) Dr. Mathew created treatment plans for inmates and advised mental health staff on how best to treat inmates, but he did not take an active role in monitoring the day-to-day mental health care of inmates at the Elkhart Jail. (*Id*. at ¶ 4.)

On June 30, 2015, Dr. Mathew conducted an initial psychiatric evaluation of Mayweather-Brown after he returned to the Elkhart Jail from a lengthy stay at another facility. (ECF 212-5 at ¶ 7.) Based on Dr. Mathew's evaluation and review of his history of behavioral issues and manipulative behavior, Dr. Mathew diagnosed him with

antisocial personality and impulse control disorders and prescribed Clonidine. (*Id.*) Dr. Mathew noted that Mayweather-Brown manipulated jail officers by threatening self-harm and often asked to be placed in a restraint chair or on suicide watch. (*Id.*) He also documented that there is no approved or effective treatment for antisocial personality disorder. (*Id.*) Several hours later, Mayweather-Brown refused his medication and expressed suicidal ideation that he had not communicated to Dr. Mathew during the initial evaluation. (*Id.* at ¶ 8.)

On July 23, 2015, Dr. Mathew met with Mayweather-Brown and noted that, during the past month, he had asked to be placed in the restraint chair only to wiggle out of it, had instigated conflicts with other inmates by spraying them with detergent, and had covered his cell with water while also throwing it at jail officers. (ECF 212-5 at ¶ 10.) Dr. Mathew recognized that Mayweather-Brown frequently used threats of self-harm to manipulate jail officers and medical staff for attention, or to get those things he wanted. (*Id.*) While most of his attempts to harm himself were minor and superficial, Dr. Mathew acknowledged that he was much more likely to hurt himself or others if jail officers or medical staff entered his cell to either restrain him or redirect his behavior. (*Id.*) He recognized that Mayweather-Brown's dangerous behavior escalated when he received attention or intervention from staff. (*Id.*) Dr. Mathew indicated that Mayweather-Brown should be housed by himself and that staff should refrain from intervening with him unless he was actively harming himself. (*Id.*) He recommended a "hands-off" treatment plan approach due to the risk of injury caused by physical intervention and instructed jail officers to ignore Mayweather-Brown's taunts and

threats. (*Id*.) Dr. Mathew assessed Mayweather-Brown's prognosis as being quite poor because he did not anticipate him choosing to or being able to modify his behavior. (*Id*.)

That same day, Dr. Mathew met with Perry, administrators, jail staff, and mental health staff to review and establish the new "hands-off" treatment plan. (ECF 212-5 at ¶ 11.) Dr. Mathews presented the treatment plan to staff as consisting of: (1) reducing physical interventions, (2) using the restraint chair when Mayweather-Brown engaged in self-harm, but not when he made threats or isolated gestures, (3) taking items out of his cell since he used anything he could find to harm himself, and (4) increasing meetings with mental health staff. (*Id*. at ¶ 10.) He explained that this treatment plan was developed not to deny Mayweather-Brown mental health care, but to deliver his mental health care to him in such a way that would minimize the chance that he would escalate his behavior and harm himself and others. (*Id*. at ¶ 11.) In other words, Dr. Mathew explained that his treatment plan was designed to prevent Mayweather-Brown from attempting to harm himself or others. (*Id*.) Far from being a do-nothing plan, as Mayweather-Brown suggests, the plan was designed to provide measured responses to his outbursts to avoid provoking acts of suicide and self-harm.

From July through October of 2015, Dr. Mathew noted that Mayweather-Brown continued to engage in predictable patterns of behavior, including manipulating others. (ECF 212-5 at ¶¶ 12-17.) Dr. Mathew met with Mayweather-Brown regularly and each meeting ended with him shouting, cursing, and arguing with Dr. Mathew. (*Id*. at ¶¶ 12, 15-17.) On October 29, 2015, Dr. Mathew met with Mayweather-Brown because of his escalating behavior. (*Id*. at ¶ 17.) He observed that Mayweather-Brown typically

threatened suicide and superficially harmed himself to fabricate an argument that he

was being neglected, and then refused or sabotaged any attempts by medical staff to

treat his injuries or protect him from harm. (*Id*.) The meeting ended early because

Mayweather-Brown refused to communicate, at which point he threatened to hang

himself. (*Id*.) As a result of this meeting, Dr. Mathew recommended that jail staff refrain

from arguing with Mayweather-Brown, minimize reactive treatment, and limit the use

of physical restraint to episodes of acute patient safety issues. (*Id*.)

On November 5, 2015, Dr. Mathew consulted with Dr. Dalmasy, the chief

psychiatrist at CCS, regarding Mayweather-Brown's treatment plan and documented

their conversation. (ECF 212-5 at ¶¶ 18, 19.) Dr. Mathew and Dr. Dalmasy both agreed

that the biggest risk of harm to Mayweather-Brown was not self-harm or suicide but

physical intervention from jail officers because he sought to escalate physical conflicts

with them. (*Id*.) Both doctors recommended that Mayweather-Brown not be given any

items in his cell as he has frequently used any item at his disposal to harm himself and

manipulate others. (*Id*.)

While Mayweather-Brown complains that Dr. Mathew improperly created a

customized treatment plan to deal with his mental health issues, he has failed to

articulate how an individualized treatment plan violated his constitutional rights. Far

from being unconstitutional, it is common practice for doctors—including

psychiatrists—to create individualized treatment plans for their patients. He also argues

that Dr. Mathew's treatment plan was tantamount to a policy or custom, which was

created to deny him adequate medical and mental healthcare. But that contention is

belied by the record in this case as Mayweather-Brown's medical records and Dr. Mathew's affidavit show that he received an unusually high amount of personalized attention from the medical and mental health staff. The record evidence establishes that Dr. Mathew's treatment plan for Mayweather-Brown was designed to keep him safe, manage his volatile behavior, and minimize his chances that he would seriously hurt himself or others. An analysis of Dr. Mathew's care of Mayweather-Brown shows that he expended considerable effort in keeping him safe and his recommendations were designed to reduce the frequency and severity of Mayweather-Brown's behavioral issues. Thus, contrary to Mayweather-Brown assertion that Dr. Mathew violated his constitutional rights by allowing him to inflict harm upon himself, his treatment plan was specifically tailored to address Mayweather-Brown's behavioral issues and mental health problems by minimizing the severity and number of his suicide attempts and reducing his chances of hurting himself and others.

While Mayweather-Brown claims Dr. Mathew's "hands-off" treatment plan was objectively unreasonable, he has not provided this court with medical evidence or an alternative treatment plan that he believes would have more appropriately addressed his behavior and mental health issues. In other words, he has not provided this court with information regarding what he believes the proper course of treatment would have been given his circumstances. He has also neither moved for the appointment of counsel nor the appointment of an expert in this case. And case law instructs that Mayweather-Brown has the initial burden of production "to inform the district court why a trial is not necessary." *Smith v. Hous. Auth. of S. Bend*, No. 3:09-CV-330, 2015 WL

1486808, at *2 (N.D. Ind. Mar. 31, 2015) (citing *Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir.2013)). In other words, the requirements imposed on the moving party "are not onerous" when it is the nonmovant who "bears the ultimate burden of persuasion on a particular issue." *Id*. Here, Mayweather-Brown has produced no evidence to show that Dr. Mathew's "hands-off" treatment approach was objectively unreasonable.

In sum, Dr. Mathew recognized that Mayweather-Brown posed very little risk of harming himself because most of his suicide threats subsequent to the July 23, 2015, implementation of Dr. Mathews' treatment plan, were empty and his incidents of self-harm were superficial and in direct response to not getting something he wanted. As stated, Dr. Mathew reasoned that he was much more likely to hurt himself or others when jail or medical staff intervened unnecessarily. Mayweather-Brown would use any item, including suicide smocks, suicide blankets, mattresses, and even paint chips to threaten to harm himself in order to provoke a response. With these factors in mind, Dr. Mathew created a treatment plan of close observation and advised jail staff to only intervene when necessary so as to prevent Mayweather-Brown from harming himself or others. Given the record in this case, the court concludes that no reasonable fact finder could find that Dr. Mathew's medical care and treatment plan were objectively unreasonable.

*Gary Yoder*

Mayweather-Brown argues that Yoder, a licensed clinical social worker, violated his constitutional rights because he knew that he faced a serious risk of danger if he did not receive adequate medical care at an appropriate facility, but he did nothing to help

him. (ECF 232-1 at 28.) Instead, he claims that Yoder simply turned a blind eye by implementing Dr. Mathew's "hands-off" treatment plan and "passively endorsed" the unconstitutional plan of treatment. (*Id*. at 29, 30.) Thus, according to Mayweather-Brown, because Yoder periodically reviewed his mental health status, he knew he required more "intense psychiatric treatment" outside of what the Elkhart Jail staff could provide him. (*Id*. at 30-31.)

On March 21, 2014, Yoder, became involved in Mayweather-Brown's care. (ECF 212-7 at ¶ 5.) Mayweather-Brown had arrived at the jail on March 20, 2014, and attempted suicide three times in his first twenty-four hours at the jail. (*Id*.) At that time, he also verbalized the fact that he intended to drown himself in the toilet and bang his head on the floor to injure himself. (*Id*.) He had also injured an officer by punching and biting him. (*Id*.) That evening, Mayweather-Brown dismantled an intercom speaker in his cell and tied the wires around his neck. (*Id*.) Given his suicidal and violent behavior, Yoder consulted with Dr. Mathew, who worked at Oaklawn Hospital before working for Elkhart Jail, to request that Mayweather-Brown be admitted for inpatient psychiatric care. (*Id*. at ¶ 6.) However, Dr. Mathew refused to admit him because Oaklawn was not equipped to manage his violent behavior. (*Id*.)

From March 2014 to June 2014, Yoder met with Mayweather-Brown, sometimes as often as every hour, to assist him during his acute mental crises, place him on suicide watches, order suicide smocks and blankets, monitor his medications, and counsel him on ways to combat his dangerous behaviors. (ECF 212-7 at ¶¶ 7-10, 13, 14, 16-22, 25.) However, Mayweather-Brown was not always receptive to Yoder's attempts to help

him with his behavioral issues. (*Id*.) Nonetheless, ~~the record in this case establishes that~~ Yoder continued to advocate for Mayweather-Brown's well-being and acted reasonably to ensure his safety during this period. (*Id*.)

When Mayweather-Brown returned to Elkhart Jail in May 2015, Yoder was once again involved in his mental health care on nearly a daily basis. (ECF 212-7 at ¶¶ 24-49, 51, 53-57.) He provided Mayweather-Brown with extensive counseling services, monitored his destructive behavior, and followed Dr. Mathew's "hands-off" treatment plan. (*Id*.) However, Mayweather-Brown continued to threaten suicide, was extremely manipulative, and placed himself, other inmates, mental health staff, and jail officers in danger. (*Id*. at 59.) In January 2016, after Mayweather-Brown left the Elkhart Jail, Yoder noted that he had been one of the most difficult inmates to treat. (*Id*.) He reiterated that Mayweather-Brown had used threats of suicide and attempts at self-harm to get things he wanted, including minor things such as turning on a television. (*Id*.) He noted that staff "had to balance that knowledge with the risk that he might actually harm himself and decide when it was appropriate to place him on suicide watch, knowing that being placed on suicide watch made Mr. Mayweather-Brown escalate his behavior." (*Id*.)

In sum, Yoder provided Mayweather-Brown with extensive counseling, monitored his behavior, and assisted Dr. Mathew in implementing the "hands-off" treatment plan. Notably, Yoder also sought to obtain additional psychiatric care for Mayweather-Brown by requesting that he be placed in a local hospital. Here, Mayweather-Brown has produced no evidence to show that Yoder's mental health care was objectively unreasonable. Given the record in this case, this court finds that no

reasonable fact finder could conclude that Yoder's mental health care was objectively unreasonable.

*Robin Yohn*

Mayweather-Brown next asserts that Robin Yohn violated his Fourteenth Amendment rights because, as a nurse, she knew the risks associated with failing to get him adequate mental health treatment. (ECF 232-1 at 33-34.) He claims she participated in the March 21, 2014, meeting where it was established that he needed treatment at an off-site state psychiatric facility where they were equipped to manage his behavior. (*Id.* at 34.) However, she failed to ensure that his civil commitment papers were properly filed so that he would have access to the necessary mental health treatment. (*Id.*)

Yohn worked as a Health Services Administrator for CCS at the Elkhart Jail during the relevant time period. (ECF 212-6 at ¶ 3.) In this role, Yohn provided administrative services such as ordering medical supplies, hiring medical staff, and maintaining nursing staff schedules. (*Id.* at ¶ 4.) She did not prescribe medications, establish treatment plans, place inmates on self-harm or suicide observation, or decide what items that inmates could have in their cells. (*Id.* at ¶¶ 4, 5.) Put simply, Yohn served as the office administrator of the medical department at the jail. (*Id.*) While Yohn is a registered nurse, she was never personally involved in Mayweather-Brown's day-to-day medical assessment or treatment. (*Id.* at ¶ 4.)

Yohn's only involvement with Mayweather-Brown, besides occasionally being present when medical or mental health personnel were providing care, was attending staff meetings to discuss the efficacy of his treatment plan. (ECF 212-6 at ¶ 5.) She

attended these meetings not as a healthcare provider or a policy maker, but as an administrative liaison between jail officers and medical staff. (*Id*.) Yohn's role in these meetings was to understand the resources required for Mayweather-Brown's care so that she could schedule nursing staff and allocate resources appropriately. (*Id*.) She did not develop his treatment plan and did not act in her role as a registered nurse to carry out the treatment plan. (*Id*.) In essence, Yohn simply managed the logistics of providing care to Mayweather-Brown, and all other inmates at the Elkhart Jail. (*Id*.)

In his deposition, Mayweather-Brown explained that he sued Yohn because "she was the one in charge of medical" and she was present during meetings to discuss his care. (ECF 212-4 at 34:12-19.) As stated, however, Yohn was only "in charge of medical" to the extent that she scheduled nursing staff, ordered supplies, and responded to grievances regarding medical issues. (ECF 212-7 at ¶ 4.) She did not treat inmates or manage treatment plans created by the medical providers. (*Id*. at ¶¶ 4, 5.) Yohn did not violate Mayweather-Brown's constitutional rights simply by being the "head of medical." She also did not provide direct care to Mayweather-Brown, nor did she direct the care that medical and mental health staff, or jail staff provided to him. (*Id*. at ¶ 5.) Furthermore, Yohn testified that when she became aware that Mayweather-Brown had either harmed himself or was going to harm himself, she notified the appropriate medical and mental health staff so they could address the issue. (*Id*.) Accordingly, because Yohn was not involved in Mayweather-Brown' medical care, no reasonable fact finder could conclude that she violated his constitutional rights under the Fourteenth Amendment.

*Steffany Bigler*

Mayweather-Brown moves for summary judgment against Lieutenant Bigler asserting that, by failing to provide him with adequate medical care, she exposed him to grave risks of harm, injury, and even death. (ECF 232-1 at 14.) He claims that she acted in "concert as a governing body making decisions as a group and instructed everyone under them to stick to the treatment plan." (*Id.* at 25.) Mayweather-Brown asserts that Bigler routinely sent memos to staff instructing them on how to treat him and ordered staff to interfere or obstruct his mental healthcare. (*Id.*) He claims that Bigler recklessly instructed staff to separate his behavior from his mental health condition. (*Id.* at 26.) Mayweather-Brown also asserts that Bigler failed to respond to a court order directing her to provide psychiatric care for him and she did not respond to his grievance about his attempts at self-harm. (*Id.* at 27.) However, Bigler testified in her affidavit as follows: "I never received a court order regarding psychiatric care of Mayweather." (*Id.* at ¶ 12.) He further asserts that Bigler instituted Dr. Mathew's "hands off" treatment plan as a form of administrative segregation to punish him. (*Id.* at 25.)

The court's review of the record shows that there is no evidence to suggest that Bigler or CCS medical staff failed to provide Mayweather-Brown with appropriate medical and mental health care from March 2014 through June 2014. First, as discussed, the record in this case shows that Mayweather-Brown received an unusually high amount of personalized treatment from the medical and mental health staff at the Elkhart Jail. Next, Bigler sought to protect his well-being by increasing Mayweather-Brown's suicide watch level and being restrained as the need arose. (ECF 212-1 at ¶ 15;

212-1 at 10.) And during the time he was on suicide watch, he was regularly monitored by jail officers. (*Id*. at ¶ 18.) Bigler also did not issue an order to interfere with or obstruct Mayweather-Brown's access to healthcare, nor did she issue an order to jail officers to ignore his serious healthcare needs. (*Id*. at ¶5.) However, she did instruct jail officers not to use force against Mayweather-Brown unless they had to gain compliance or protect him from serious bodily harm or injury. (*Id*. at ¶ 6.) Bigler also instructed jail officers to contact CCS so that any injuries he sustained from his mental health issues could be documented and evaluated. (*Id*. at ¶ 7.) Thus, Bigler took steps to implement appropriate measures to safeguard Mayweather-Brown from committing suicide and to protect him.

Mayweather-Brown has also asserted several propositions that are not supported by the record. For example, Bigler did not issue an order or instructions to jail officers concerning Mayweather-Brown's medical or mental health treatment. (ECF 212-1 at ¶ 11.) Nor did she receive a court order regarding his psychiatric care. (*Id*. at ¶ 12.) Bigler was also not aware that Mayweather-Brown filed a grievance at the jail about his attempts to harm and that grievance was ignored. (*Id*. at ¶ 18.) While Mayweather-Brown makes an issue about the fact that Bigler informed jail officers that his "mental health status and disciplinary status are not the same and do not depend on each other," that fact is irrelevant to whether he received constitutionally adequate medical care while he was housed at the Elkhart Jail. (ECF 212-1 at ¶ 8; 212-1 at 6.)

In sum, Mayweather-Brown was a threat to his own safety and that of jail staff. He engaged in altercations with jail officers and injured some of them. Mayweather-

Brown also caused extensive damage to the Elkhart Jail and made multiple attempts at suicide. He routinely refused medical treatment, sometimes violently. Because of his behavior, on June 2, 2014, the Sheriff's Department requested and obtained a court order from the Elkhart Superior Court under Cause No. 20D02-1402-FC-48 to transfer Mayweather-Brown to the IDOC for safekeeping. (ECF 212-2 at ¶ 8; 212-2 at 40.) Given Bigler's extensive role in managing and monitoring Mayweather-Brown's medical and mental health care during this period, no reasonable fact finder could find that the care was objectively unreasonable.

Furthermore, after Mayweather-Brown returned to the jail in May 2015 and until he left in January 2016, Bigler was entitled to rely on the medical and mental health staff to provide adequate and appropriate care to him. In other words, non-medical staff who rely on medical experts are "entitled to relegate to the prison's medical staff the provision of good medical care." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009); *Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006). That is what happened in this case. Bigler reasonably relied on the CCS medical staff to make decisions regarding Mayweather-Brown's medical and mental healthcare issues. (ECF 212-1 at ¶ 10.) As discussed, Dr. Mathew worked on CCS's staff and crafted the "hands-off" treatment plan which was specifically tailored to treat Mayweather-Brown's mental health issues and protect him from self-harm. Yoder along with other medical and mental health staff worked with Mayweather-Brown to combat his mental health issues by providing him with counseling, medication, suicide observation to keep him save, and by addressing a myriad of daily issues. Given the substantial medical record detailing the personalized

and daily treatment Mayweather-Brown received from the medical and mental health staff, Bigler's reliance on the judgment of these trained medical professionals cannot be viewed as being objectively unreasonable. Therefore, no reasonable fact finder could find that Bigler violated Mayweather-Brown's Fourteenth Amendment rights.

*John Perry*

Mayweather-Brown moves for summary judgment against Captain Perry asserting he provided him with constitutionally inadequate medical care because he "assisted, condoned, and consented" to Dr. Mathew's "hands-off" treatment plan. (ECF 232-1 at 18.) He next complains that Perry violated IDOC policy by ignoring the provision of the policy that prohibits the creation and implementation of the "hands-off" treatment plan—a plan that Mayweather-Brown believes constitutes cruel and unusual punishment. (*Id*. at 20.) Furthermore, Mayweather-Brown claims that Perry's job duties that included "accumulat[ing] information and reports for future legal defense" led the Defendants to "falsify medical documents and transfer paperwork." (*Id*. at 22.)

As discussed, Mayweather-Brown was provided with constitutionally adequate medical and mental health care while he was housed at the Elkhart Jail. Like Bigler, Perry was entitled to rely on the professional judgment of the medical and mental health staff who treated Mayweather-Brown. *Burks*, 555 F.3d at 595. To the extent, Mayweather-Brown claims Perry violated prison policy by condoning Dr. Mathew's treatment plan, failure to follow policy is not a constitutional violation. *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("However, 42 U.S.C. § 1983 protects plaintiffs from

constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices."). Furthermore, Mayweather-Brown has produced no evidence to support his contention that Perry or the Defendants' falsified his medical records and transfer paperwork. Therefore, there is no evidence for this court to conclude that Perry's conduct was objectively unreasonable given the facts in this case.

In conclusion, Mayweather-Brown's motion for summary judgment is denied as to inadequate medical care claim brought pursuant to the Fourteenth Amendment and the Defendants' motions for summary judgment are granted as to this claim.

*Conditions of Confinement Claim*

In moving for summary judgment, Mayweather-Brown also asserts that Perry, Bigler, and Yoder failed to provide him with appropriate conditions of confinement, including adequate clothing, bedding, and heat while housed at the Elkhart Jail in violation of his Fourteenth Amendment rights. (ECF 202; 232.) He specifically argues that these defendants were deliberately indifferent to his needs and subjected him to a substantial risk of harm by denying him appropriate accommodations during those periods he was on suicide watch and suffering from his mental illness. On the other hand, the Defendants claim they were not deliberately indifferent to Mayweather-Brown's confinement needs and sought to protect him by denying him access to blankets, clothing, and mattresses because he often used these items to attempt suicide. (ECF 211 at 12; 214 at 15.) Here, the Defendants explain that, because they relied on the advice of the medical and mental health staff, their conduct in removing items from

Mayweather-Brown that he could use to commit suicide does not constitute deliberate indifference on their part. (ECF 214 at 15.)

On August 12, 2019, the Seventh Circuit in *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019) held that "Kingsley's objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees." 933 F.3d at 823. Because the standard for conditions of confinement claims has changed, the court denies the parties' motions (ECF 200; 210; 213) with respect to this issue with leave to refile a summary judgment motion addressing only the "objective unreasonableness" standard articulated in *Hardeman*.[6]

Therefore, the court:

(1) DENIES Quintin J. Mayweather-Brown's Motion to Strike (ECF 271);

(2) DENIES Quintin J. Mayweather-Brown's Motion for a Preliminary Ruling on the Admissibility of Evidence (ECF 277);

(3) DENIES Quintin J. Mayweather-Brown's Motion for the Taking of Judicial Notice of Law (ECF 278);

(4) DENIES Quintin J. Mayweather-Brown's Motion to Rule on the Motion for the Taking of Judicial Notice of Law (ECF 279);

(5) DENIES Quintin J. Mayweather-Brown's Motion for Preliminary Ruling on the Admissibility of Newly Discovered Evidence (ECF 280);

---

[6] The parties may, if they chose, incorporate the court's facts in lieu of a separate Statement of Material Facts. *See* N.D. Ind. L.R. 56-1(a).

(6) DENIES Quintin J. Mayweather-Brown's Motion for Admissibility of Evidence and Motion for Preliminary Ruling on Newly Obtained Evidence (ECF 287); and

(7) DENIES Quintin J. Mayweather-Brown's Motion for the Taking of Judicial Notice of Adjudicative Facts (ECF 289).

(8) DENIES Quintin J. Mayweather-Brown's Motion for Summary Judgment (ECF 200) on the issue of whether he received constitutionally adequate medical care while housed at the Elkhart Jail in violation of the Fourteenth Amendment;

(9) GRANTS Lieutenant Steffany Bigler, Captain John Perry, Dr. Josh Mathew, Robin Yohn, and Gary Yoder's Motions for Summary Judgment (ECF 210; 213) on the issue of whether Quintin J. Mayweather-Brown received constitutionally adequate medical care while housed at the Elkhart Jail in violation of the Fourteenth Amendment;

(10) DENIES Mayweather-Brown's Motion for Summary Judgment (ECF 200) on the conditions of confinement issue with leave to refile a summary judgment motion on this issue only utilizing the "objective unreasonableness" standard for Fourteenth Amendment claims pertaining to conditions of confinement issues as articulated in *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019) by **October 31, 2019**; and

(11) DENIES Lieutenant Steffany Bigler, Captain John Perry, Dr. Josh Mathew, Robbin Yohn, and Gary Yoder's Motions For Summary Judgment (ECF 210; 213) on the conditions of confinement issue with leave to refile a motion for summary judgment on this issue only utilizing the "objective unreasonableness" standard for Fourteenth

Amendment claims pertaining to conditions of confinement issues as articulated in

*Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019) by **October 31, 2019**.

SO ORDERED on September 30, 2019

_____/s/ JON E. DEGUILIO_____
JUDGE
UNITED STATES DISTRICT COURT