UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

QUINTIN J. MAYWEATHER-BROWN,

Plaintiff,

v.                                             CAUSE NO.: 3:14-CV-2089-JD-MGG

STEFFANY BIGLER, et al.,

Defendants.

## OPINION AND ORDER

Quintin J. Mayweather-Brown, a prisoner without a lawyer, was granted leave to
proceed against Steffany Bigler, John Perry, and Gary Yoder for failing to provide him
with constitutionally adequate conditions of confinement, including adequate clothing,
bedding, and heat while housed at the Elkhart County Jail ("Elkhart Jail") in violation of
the Fourteenth Amendment. (ECF 32, 143.) He was also granted leave to proceed
against Bigler, Perry, Yoder, Dr. Josh Mathew, and Robin Yohn for failing to provide
him with constitutionally adequate medical care while housed at the Elkhart Jail in
violation of the Fourteenth Amendment. (*Id*.) On October 1, 2019, the court issued an
Amended Opinion and Order (ECF 299) denying Mayweather-Brown's motion for
summary judgment on the issue of whether he received constitutionally adequate
medical care while he was housed at the Elkhart Jail in violation of the Fourteenth
Amendment and granting the Defendants' motions on the same issue. The court further
denied the parties' motions for summary judgment on the conditions of confinement
issue with leave to refile their motions utilizing the "objective unreasonableness"

standard for Fourteenth Amendment claims pertaining to conditions of confinement issues as articulated in *Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019).

On October 31, 2019, Defendants Mathew, Yohn, and Yoder filed their motion for summary judgment, as it relates to Yoder, on the conditions of confinement issue.[1] (ECF 306.) About a month later, on November 27, 2019, Defendants Bigler and Perry filed a motion for summary judgment on the same issue. (ECF 314.) The parties' motions for summary judgment were accompanied by notices informing Mayweather-Brown of the motions as required by N.D. Ind. L.R. 56-1(f). (ECF 308, 318.) Next, on December 12, 2019, Mayweather-Brown filed a summary judgment motion on the conditions of confinement issue, but he later withdrew that motion along with his related filings. (ECF 324, 356.) On February 24, 2020, Mayweather-Brown filed a response to the Defendants' motions for summary judgment. (ECF 352.) On March 12, 2020, Defendants Mathews, Yohn, and Yoder filed a reply. (ECF 357.) Several weeks later, on March 23, 2020, Defendants Bigler and Perry filed their reply. (ECF 358.) On March 24, 2020, Mayweather-Brown filed a sur-reply. (ECF 360.) Thus, the motions are now fully briefed.

Furthermore, Mayweather-Brown has filed a "Motion to Exclude Relivent (sic) Evidence (on grounds of prejudice, confusion or waste of time) and Exclusion of Character Evidence" which this court construes as a motion to strike. (ECF 359.) It is the function of the court, with or without a motion to strike, to carefully review the

---

[1] Mayweather-Brown did not bring a Fourteenth Amendment conditions of confinement claim against either Mathew or Yohn.

evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record. *See, e.g., S.E.C. v. KPMG LLP*, 412 F. Supp. 2d 349, 392 (S.D.N.Y. 2006), *superseded on other grounds as recognized in S.E.C. v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017); *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, No. 04 C 5167, 05 C 2253, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, No. 03 C 2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F. Supp. 2d 917, 920 n.1 (N.D. Ind. 2004). Mayweather-Brown's motion will be denied, but the court notes that, in ruling on the motion for summary judgment, the court considers only relevant evidence that could be presented in an admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2); *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). The court is able to sift through the evidence and to consider each piece under the applicable federal rules; thus, there is no need to address Mayweather-Brown's motion to strike and it will be denied.

FACTS[2]

As a threshold matter, Mayweather-Brown's response brief is deficient and does not comply with Federal Rule of Civil Procedure 56 or the Local Rules of this Court. *See* N.D. Ind. L.R. 56-1. In his response brief, Mayweather-Brown contends that there are material facts that are genuinely disputed. In support of this proposition, Mayweather-

---

[2] The facts in the case have already been set forth in detail by this court in the earlier order granting summary judgment on Mayweather-Brown's medical claims. (ECF 299.) In this order, the facts are limited to those directly relevant to the issue currently before the court.

Brown provides five numbered paragraphs under "Statement of Material Facts that are in Genuine Dispute." (ECF 352 at 4.) However, none of these paragraphs contain citations to any evidence that supports his argument that there are materials facts that are genuinely in dispute. (*Id*.) Mayweather-Brown cannot create issues of material fact with statements that lack citations.

Mayweather-Brown's response brief also contains a second section titled, "Where in Support of Plaintiff's Response Brief in opposition to the Defendants' Summary Judgment, the Material Facts are as follows" which contain ten bullet-point paragraphs. (ECF 352 at 4-5.) However, while some of these paragraphs are supported by citation to evidence, and they have been considered to the extent that they are supported by citations, the statements are largely irrelevant to any material issue. (*Id*. at 5.) Many of the statements in his response brief are merely statements of times when he did not have a mattress and his conclusion that he was deprived of adequate bedding. (*Id*. at 6-11.) These legal conclusions are not admissible at trial, and therefore will not be considered here. *Liberles v. Cook County*, 709 F.2d 1122, 1129 (7th Cir. 1983). He also asserts that there is a material fact claiming that he was deprived of adequate heating. (*Id*. at 6.) However, he cannot circumvent his deposition testimony by citing a self-serving affidavit. *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions").

*Parties*

Mayweather-Brown was a pretrial detainee at the Elkhart Jail from March 20, 2014, to June 6, 2014, when he was transferred to the Indiana Department of Correction ("IDOC"). (ECF 212-2 at ¶ 5, 212-2 at 6-8, 42-55, 212-4 at 27:15-20.) He returned to the Elkhart Jail on May 22, 2015, and remained there until January 21, 2016, when he was again transferred to the IDOC. (*Id.*)

Mayweather-Brown is proceeding against Lieutenant Bigler, Captain Perry, and Yoder on his conditions of confinement claim. Bigler was employed by the Elkhart County Sheriff's Department ("Sheriff's Department") as a Sergeant, Lieutenant, and Corrections Officer in the Corrections Division from February 2013 through October 2015. (ECF 212-1 at ¶¶ 2, 3, 316-1 at ¶ 3.) Perry was employed by the Sheriff's Department as the Captain of the Corrections Division throughout the time period relevant to this case. (ECF 212-2 at ¶¶ 2, 3.)

Yoder is a licensed clinical social worker and was employed by Correct Care Solutions ("CCS") at the Elkhart Jail during the relevant period. (ECF 212-7 at ¶¶ 2, 3.) He assisted inmates who had acute mental health issues and worked with doctors who developed treatment plans for inmates. (*Id*. at ¶ 4.)

*Elkhart Jail*

The Elkhart Jail is a modern building that was completed in 2007. (ECF 316-1 at ¶ 14, 316-2 at ¶ 8.) The temperature throughout the building, including the wards where the inmates are housed, is maintained at about 71 to 72 degrees Fahrenheit. (ECF 316-2 at ¶ 8.) No cell in the Elkhart Jail has an individual thermostat. (ECF 316-1 at ¶ 14.) In

accordance with Indiana Code 11-12-4-2, IDOC is responsible for conducting annual inspections of the Elkhart Jail. (ECF 316-2 at ¶ 9). A category of the inspection reports pertains to the physical plant and includes the temperatures at the time of inspection. (*Id.*) The reports from 2013 through 2017 show that the temperature in the Elkhart Jail ranged from 71 to 73.3 degrees Fahrenheit, clothing and bedding were adequate for the prevailing temperature, and suitable clothing and bedding were provided to the inmates. (ECF 316-2 at ¶ 9, 316-2 at 8, 11, 23, 26, 38, 41, 53, 56, 68, 71.)

*Suicide Watch Policy*

Pursuant to CCS policy, CCS staff and jail staff may initiate a suicide watch at any time if a staff member is concerned that an inmate is at risk of engaging in self-harming behavior. (ECF 316-1 at ¶ 4.) When an inmate is placed on suicide watch, there may be restrictions placed on an inmate's access to blankets, clothing, and bedding. (*Id.* at ¶ 5.) For example, an inmate on suicide watch may be given a smock made of thick padded material commonly referred to as a "suicide smock" instead of the standard inmate uniform. (*Id.*) An inmate on suicide watch may also be given a mattress and single blanket made of special tear-resistant material commonly referred to as a "suicide blanket" instead of standard inmate bedding consisting of sheets and blankets. (*Id.*) All decisions concerning bedding and clothing provided to inmates on suicide watch are made by CCS staff. (*Id.* at ¶ 6.) Inmates on suicide watch are housed in a padded cell with padding on the walls and floor. (*Id.* at ¶ 7.) The temperature inside a padded cell is warmer than the temperature in a regular cell due to the insulated effect of the padding. (*Id.*)

*Confinement at Elkhart Jail*

During the relevant period, Mayweather-Brown regularly threatened to commit suicide, engaged in incidents involving suicide threats, attempted to harm himself on multiple occasions, threatened medical and jail staff, and destroyed prison property.

### March 20, 2014 to June 6, 2014

On the morning of March 20, 2014, Mayweather-Brown was booked into the Elkhart Jail. (ECF 212-3 at 55.) Immediately upon his intake, he was referred to mental health staff because he had made suicide threats to the police officers transporting him to jail. (*Id.* at 53-54.) Dr. John Foster evaluated him and prescribed antidepressant and antipsychotic medications. (*Id.* at 56.) Mayweather-Brown told medical staff that, "If I go in a padded cell I will cause problems for everyone." (*Id.* at 61.)

At 2:00 p.m. that day, Mayweather-Brown became upset about his legal charges and was taken to a classroom to walk around and calm down. (ECF 212-3 at 73.) At 2:21 p.m., he attempted to hang himself with a blanket and then complained of not being able to feel his body from his neck down. (*Id.* at 76-77.) Jail officers, however, were able to see there was slack in the blanket around his neck and he was moving his head on his own. (*Id.*) At 3:30 p.m., Mayweather-Brown refused his medication, stating "Don't give me a f****** shot. That s*** better be court ordered. I ain't taking s***." (*Id.* at 68.) He was extremely agitated and aggressive, and stated that he would "get every worker here." (*Id.*) At around 9:30 p.m., he tied a wire around his neck and threatened suicide. (*Id.* at 64.)

The next day, on March 21, 2014, at 9:40 a.m., Mayweather-Brown was evaluated by mental health staff. (ECF 212-3 at 96.) They noted that he had attempted to kill himself three times in the past twenty-four hours, verbalized intentions to drown himself, threatened to bang his head on the floor until he injured himself, and injured an officer by punching and biting him. (*Id.*) Mayweather-Brown also dismantled the intercom system in his room and tied the wires from the intercom system around his neck. (*Id.*)

At 9:47 a.m., Mayweather-Brown refused to give his blanket and sleeping mat to jail officers. (ECF 212-3 at 92.) He was verbally abusive and threatened jail officers. (*Id.*) They deployed pepper spray to gain control of Mayweather-Brown and he was placed in a restraint chair. (*Id.*) Once restrained, he stated that, after he was released from the chair, he was going to "bang [his] head on the floor until [he had] a concussion." (*Id.*) He then threatened to "kill every officer." (*Id.*) At 12:00 p.m., while he was still being restrained, Mayweather-Brown threatened to drown himself by putting his head in the toilet. (*Id.* at 88, 93, 95.) He continued to yell, threaten himself and threaten staff, and refused to take his medications. (*Id.*)

Yoder, a licensed clinical social worker at the jail, initially became aware of Mr. Mayweather-Brown on March 21, 2014, when met with jail and medical staff. (ECF 212-7 at ¶ 5.) Yoder consulted with Dr. Mathew, a psychiatrist at Oaklawn Hospital, to request that Mayweather-Brown be admitted for inpatient psychiatric care. (*Id.* ¶ 6.) Dr. Mathew refused to admit him because Oaklawn was not equipped to manage his violent behavior. (*Id.*)

On March 24, 2014, at about 3:00 p.m., Mayweather-Brown put his face in the toilet to drown himself. (ECF 212-3 at 123.) Later that afternoon, he was placed in the restraint chair because he was picking paint chips off his cell wall. (*Id.*) The next day, on March 25, 2014, at 9:40 a.m., he was observed putting a towel around his neck and was placed in the restraint chair. (*Id.* at 132-34.) Mayweather-Brown then began yelling at officers. (*Id.* at 139.) He was offered the chance to return to his cell but stated that, if he was placed back in his cell, he would get paint chips off the wall to slit his throat. (*Id.* at 148.) At 6:10 p.m., Mayweather-Brown was released from the restraint chair and was given a suicide smock and blanket. (*Id.* at 149.) However, because he refused to enter his cell without a sleeping mat, he was placed back in the restraint chair. (*Id.*)

On March 27, 2014, Yoder followed-up with Mayweather-Brown and noted that his behavior had improved somewhat. (ECF 212-3 at 162.) Mayweather-Brown asked that his suicide watch level be downgraded but Yoder refused to do so because there were reports of Mayweather-Brown attempting to harm himself. (*Id.* at 162, 165.)

The next day, on March 28, 2014, Mayweather-Brown was placed on a level-three suicide watch. (ECF 212-3 at 171.) After learning he was not going to be bonded out from jail by his family, he began screaming "I'm going to finish what I started, this is going to be a long weekend." (*Id.*)

On March 29, 2014, at 9:30 p.m., Mayweather-Brown was observed ripping his sleeping mat cover apart and telling officers that he was going to "slit his f****** wrist." (ECF 212-3 at 182.) He was put in the restraint chair briefly and then released back to his cell when he agreed to take his medication. (*Id.*) Two days later, on March 31, 2014, an

Elkhart Superior Court Judge authorized jail doctors to administer medication over Mayweather-Brown's objection due to his extreme behavior. (*Id*. at 185.) Mayweather-Brown also made several gestures to harm himself by tying things around his neck. (*Id*. at 187.)

In April 2014, Mayweather-Brown continued to display suicidal and combative behaviors. On April 1, 2014, he told officers that he would tear up a padded cell if he were put in one and, after officers put him in a padded cell, he destroyed it. (ECF 212-3 at 201.) On April 10, 2014, Mayweather-Brown reported that he ingested multiple pills and swallowed shampoo. (*Id*. at 233, 236.) On April 14, 2014, he became upset when nursing staff crushed his medication into a cup without him being able to watch. (*Id*. at 254.) He cursed, yelled at, and threatened the nursing staff. (*Id*.) On April 29, 2014, Mayweather-Brown became aggressive and combative with jail officers and was placed in the restraint chair. (*Id*. at 299, 301.)

The next day, on April 30, 2014, at 2:30 p.m., Mayweather-Brown said he was going to harm himself and then proceeded to make cutting actions at his wrist with the spoon. (ECF 212-3 at 311.) At 2:50 p.m., he yelled that he was going on a hunger and water strike. (*Id*. at 309.) At 3:30 p.m., Mayweather-Brown threatened to bang his head against a railing, saying "what are you going to do to stop me?" (*Id*. at 311.) He then became violent with jail officers, made verbal threats, and began thrashing his body around in the restraint chair. (*Id* at 310.) He also made suicidal statements to jail officers. (*Id*. at 315.)

On May 1, 2014, Mayweather-Brown attempted to harm himself again. (ECF 212-3 at 323.) Jail officers tried to place him in the restraint chair, but he became combative and spit at them. (*Id.*) He grabbed the officers' hands and tried to twist and break their fingers. (*Id.*) Mayweather-Brown hit the officers with his knees and attempted to use his head as a weapon. (*Id.*) After being placed in the restraint chair, he threated officers, saying "I'm going to f*** you up! Stop touching me, I'll kill you! You don't have a soul." (*Id.* at 339.)

The next day, on May 2, 2014, at 5:25 p.m., Mayweather-Brown refused to return an ice pack he had been given for his neck and stated that "the officer over there pissed me off so I'm not giving this back and [I am] going to eat it." (ECF 212-3 at 342-44, 349.) At 8:10 p.m., while a nurse examined him, he stated: "Nurse, look I am cutting myself. Nurse, I am harming myself aren't you going to do anything?" (*Id.* at 349.) At 9:00 p.m., a nurse observed Mayweather-Brown in his cell with a small metal object that he was using to make small lacerations to his left arm. (*Id.* at 345-46.) He refused to give jail officers the piece of metal and appeared agitated and combative. (*Id.*) At 11:00 p.m., Mayweather-Brown yelled at a jail officer stating: "I don't like your face Goodwin, you make me agitated." (*Id.* at 345.)

On May 3, 2014, at 1:25 a.m., CCS staff examined Mayweather-Brown because he had been banging his head on the wall, had a headache, and was having blackouts. (ECF 212-3 at 353.) At 4:12 a.m., he refused his breakfast and announced he was going on a hunger strike. (*Id.*) He also made verbal threats against the medical and jail staff. (*Id.* at 357-58.)

On May 9, 2014, Mayweather-Brown was placed on suicide watch because he made suicidal statements, which he later denied. (ECF 212-3 at 375.) After being placed on suicide watch, he engaged in a series of self-harming behaviors. (*Id.*)

Several days later, on May 12, 2014, an inmate placed a call from the intercom system in Mayweather-Brown's cell to inform prison staff that someone was thinking of suicide. (ECF 212-3 at 385.) Mayweather-Brown and his cellmate denied making the call and both inmates were placed on suicide watch. (*Id.*)

On May 17, 2014, Mayweather-Brown became agitated and verbally threatened others. (ECF 212-3 at 401-02.) He stated that he "is suing all of medical and none of you mother******* will have anything left when I'm done with ya." (*Id.*) He began throwing paper, tubes of toothpaste, and other items through the tray slot in his door. (*Id.*) He also squirted water from the toilet using a glove and aimed at jail and medical staff, and electronic equipment. (*Id.*)

On May 18, 2014, Mayweather-Brown began flooding his cell and yelling "I will hit my head against this wall until I'm put in the chair!" (ECF 212-3 at 413-14.) He then yelled "I am going to make sure to stay in this chair until first shift! Ya'll wanna learn how to do what I do? This video will be on YouTube, take a lesson from me. I can tear this place down! I already know how I'm gonna get outta this chair. Now I'm hydrated, b******! It's on! Cooley, you're a b****." (*Id.*) He continued yelling at jail and medical staff as well as other inmates and broke a railing while in the restraint chair. (*Id.*)

On May 20, 2014, at 10:15 a.m., Mayweather-Brown was briefly placed in the restraint chair. (ECF 212-3 at 424.) He ripped his shirt and banged his head against the

windows. (*Id.*) Mayweather-Brown also began cutting his wrist with a piece of a comb. (*Id.* at 429.) At 11:00 a.m., he verbalized suicidal ideations to Yoder and jail staff, and he was placed on suicide watch. (*Id.* at 426-27.) From 1:00 p.m. and 2:00 p.m., Mayweather-Brown was making superficial cuts to his left arm using a piece of plaster he picked off his cell wall. (*Id.* at 425.) He believed that he was being treated unfairly because he was only allowed to have the safety smock and safety blanket in his cell with him. (*Id.*) He admitted that he tore the smock before it was taken away from him. (*Id.*) Mayweather-Brown also threw his lunch tray at the wall and urinated on the floor of his cell and then requested a clean cell and blanket. (*Id.*) He was told he would need to refrain from harming himself before he could have a blanket. (*Id.*) At 2:15 p.m., Mayweather-Brown began making superficial cuts to his neck and stated that he wanted to bleed everywhere. (*Id.* at 425, 428-29.) At 5:21 p.m., he called out for medical staff to clean his wounds, but he would not surrender the paint chip to jail officers and continued to scratch himself. (*Id.* at 432.)

The next day, on May 21, 2014, at 6:20 p.m., Mayweather-Brown told a nurse that if he was not triaged, he would stab himself in the neck. (ECF 212-3 at 438.) He was then observed holding a broken plastic spoon in his hands. (*Id.*) Mayweather-Brown stated that he was upset because his neck was sore since he did not get a mat to sleep on until 11 p.m. the night before. (*Id.*) Because a nurse was not available to immediately triage him, he continued to scream and threatened to hurt himself. (*Id.*) Yoder then advised jail officers to remove the plastic spoon from his cell and keep him on level-two suicide watch. (*Id.*) At 7:30 p.m., he was observed holding pieces of ripped blanket that had

been tied together. (*Id*. at 437.) He was persuaded to hand over the strings and ripped blanket and admitted he behaved this way so that others would listen to him. (*Id*.)

On June 22, 2014, Mayweather-Brown announced over the intercom that he wanted to kill himself and he was subsequently placed on level-two suicide watch. (ECF 212-3 at 469-70.)

On July 1, 2014, Mayweather-Brown left the Elkhart Jail. (ECF 212-3 at 487, 499, 503.) He returned on July 18, 2014, but he left again on July 21, 2014. (*Id*.) Between May 2, 2015, and May 29, 2015, he was in and out of the Elkhart Jail. (*Id*.)

### *May 29, 2015 to January 21, 2016*

On May 29, 2015, Mayweather-Brown was placed in the restraint chair from 6:30 p.m. to 7:47 p.m. because he had an altercation in the housing pods. (ECF 212-3 at 518, 521.) The next day, on May 30, 2015, he advised jail officers that he was having suicidal thoughts. (*Id*. at 531.) Yoder placed Mayweather-Brown on suicide watch. (*Id*.)

Between June 1, 2015, and June 26, 2015, Mayweather-Brown was periodically in and out of the Elkhart Jail. (ECF 212-3 at 541.)

During June 2015, Yoder met with Mayweather while he was on suicide watch. (ECF 212-3 at 547, 565, 594.) Yoder noted that he made veiled suicide threats after he was sent to segregation for being written-up. (*Id*. at 547.) Mayweather-Brown was also angry about how he was being treated. (*Id*. at 565.)

On June 26, 2015, Mayweather-Brown expressed his irritation about his security placement. (ECF 212-3 at 598.) He implied that he would "go off" if things did not go his way and he would need the restraint chair. (*Id*.)

On June 30, 2015, Dr. Joshua Mathew[3], a psychiatrist, conducted a psychiatric evaluation of Mayweather-Brown. (ECF 212-3 at 599-601.) He noted that Mayweather-Brown had a history of extreme attention-seeking behavior, manipulating others by threatening self-harm, and uncontrollable behavior. (*Id*.) Mayweather-Brown told Dr. Mathew that he was justified in acting out. (*Id*. at 599.) Dr. Mathew documented his antisocial personality and impulse control disorders. (*Id*.)

At 7:40 p.m. on the same day, Mayweather-Brown told a nurse and jail officers that he wanted to hurt himself. (ECF 212-3 at 603.) The nurse asked him to repeat himself and he screamed at her because he had already stated he would hurt himself and did not want to say it again. (*Id*.) The nurse asked him again if he was going to hurt himself and he responded, "take it however you want." (*Id*.) Mayweather-Brown then stated, "you had better get mental health here because they are fixing to see how I can really act and by the end of the night I will be in the restraint chair and nobody will be safe tonight." (*Id*.) Yoder was consulted and recommended that he be placed on level-three suicide watch. (*Id*.) Mayweather-Brown responded by stating "the only way you will move me is with force." (*Id*.) He later made suicidal threats and superficial cuts to his wrists with a spoon. (*Id*. at 610, 613-14.)

On July 1, 2015, Mayweather-Brown was agitated and yelling that he was going to sue jail and medical staff. (ECF 212-3 at 614.) He stated that he was suicidal earlier

---

[3] Dr. Mathew previously worked at Oaklawn Hospital and denied Mayweather-Brown admission because of his aggressive behavior. But by June 2015, Dr. Mathew was working at the Elkhart Jail and employed by Correct Care Solutions. (ECF 215-5 at ¶¶ 3, 5.)

and should have been moved. (*Id.*) However, jail officers did not move him because he attempted to fight with them. (*Id.*)

A week later, on July 8, 2015, Mayweather-Brown expressed suicidal ideation because he was angry about his housing placement. (ECF 212-3 at 622.) After being placed on a level-three suicide watch, he told Yoder: "When I'm pissed I might say something. I'm not going to hurt myself." (*Id.* at 624.)

On July 10, 2015, at 6:00 p.m., Mayweather-Brown yelled to a nurse that he was going to hang himself and then placed a piece of fabric against his throat. (ECF 212-3 at 626.) He was irrational, yelling obscenities, and inconsolable. (*Id.*) Mayweather-Brown then assaulted two jail officers and was placed on level-three suicide watch. (*Id.*)

Two days later, on July 12, 2015, Mayweather-Brown was angry because he was given ground chicken instead of chicken nuggets, refused his lunch tray, and asked to be given a new tray. (ECF 212-3 at 630.) He covered the inside of his cell window with paper. (*Id.*) On July 13, 2015, Mayweather-Brown made suicidal threats to jail officers and remained on suicide watch. (*Id.* at 632.)

On July 19, 2015, at 9:30 a.m., Mayweather-Brown stated that he would hang himself because his television was not turned on and was placed on level-three suicide watch. (ECF 212-3 at 643.) Jail officers escorted him to the medical unit where he told staff that they were not doing their jobs and threatened to file a lawsuit. (*Id.* at 645.) He became aggressive and jail officers escorted him to the booking unit. (*Id.*)

At 9:50 a.m. that day, Mayweather-Brown was placed in the restraint chair. (ECF 212-3 at 645-46.) A nurse then attempted to check his feet, but he responded "you better

not touch me you fat f****** nasty a** b****, you try to take my socks and you will have to do a use of force. You better not touch me. Quit provoking me." (*Id.* at 649.) By 10:00 a.m., Mayweather-Brown was able to get out of the shoulder restraints of the restraint chair and stated, "I told you I'd be out of them in [three] minutes." (*Id.*) He continued yelling and threatening jail officers, but they managed to place him back in the shoulder restraints. (*Id.*) At 10:30 a.m., Mayweather-Brown continued to be verbally aggressive and called a jail officer a "f****** idiot." (*Id.* at 650.) He told jail officers that he had a right to put his hands on them if he felt threatened. (*Id.*)

On July 22, 2015, Mayweather-Brown was placed in the restraint chair because of his aggressive behavior and verbal threats. (ECF 212-3 at 660.) He told one jail officer that "I've already got [ten] lawsuits goin' against you." (*Id.*) Yoder met with him on suicide watch and noted that, given his persistent pattern of hostility, Dr. Mathew would need to evaluate whether he could be released from suicide watch. (*Id.* at 663.)

The next day, on July 23, 2015, Dr. Mathew met with Mayweather-Brown. (ECF 212-3 at 667). He recommended that Mayweather-Brown be housed separately—and not with his peers—because of the risk of conflict. (*Id.* at 672.) Dr. Matthew noted that there was no environment that would be completely safe for him and he was insistent on harming himself and blaming jail officers. (*Id.*) He did not believe that a restraint chair or padded cell would be any safer than his current cell, but physical intervention from jail officers increased the risk of harm to Mayweather-Brown and the jail staff. (*Id.*) Dr. Mathew recommended a hands-off approach for treating Mayweather-Brown. (*Id.*)

That same day, Dr. Mathew met with Perry to establish a hands-off approach to manage Mayweather-Brown for his own safety, and for the safety of jail officers and healthcare staff. (ECF 212-5 at ¶ 11.) Dr. Mathew decided on this hands-off approach by analyzing his past behavior and determining that his behavior escalated when medical and jail staff tried to intervene or tried to control his environment. (*Id.*) Dr. Mathew determined that a hands-off approach was best because he thought it would be the best way to prevent Mayweather-Brown from attempting to harm himself or harming others. (*Id.*)

At 11:42 a.m. on July 23, 2015, Mayweather-Brown threatened to start "hitting his head on the wall." (ECF 212-3 at 665-66.) Jail officers were able to observe his behavior through the camera in his cell and saw him cover the window of his cell with paper and his sleeping mat. (*Id.*)

On July 24, 2015, at 12:15 p.m., Mayweather-Brown broke the light fixture in his cell, held up a piece of glass, and stated to a nurse "I'm going to swallow this." (ECF 212-3 at 689-90.) He was moved to another cell for his own safety. (*Id.*) At 3:50 p.m., jail officers were told he had swallowed glass, but one officer told the nursing staff to disregard the alleged incident because he did not have any glass in his cell. (*Id.* at 689.)

Several days later, on July 26, 2015, Mayweather-Brown told Nurse Elizabeth Rodriguez, "Don't come near me, I will spray you, I will spray anyone that comes near me!" (ECF 212-3 at 692.) She observed him waving a plastic container with urine. (*Id.*) Nurse Rodriguez later saw Mayweather-Brown throw a cup of urine at a jail officer. (*Id.*)

On August 5, 2015, Mayweather-Brown made four cuts to his right forearm with glass he found in his cell. (ECF 212-3 at 714.) While a nurse cleaned and bandaged his arm, he stated, "pretty soon, it's gonna be my neck." (*Id.*) Mayweather-Brown was then placed on suicide watch. (*Id.* at 712-15.)

Next, on August 10, 2015, at 12:10 p.m., Mayweather-Brown had something tied around his neck. (ECF 212-3 at 726.) When jail officers entered the cell, he was holding a piece of fabric from his mattress cover. (*Id.*) Mayweather-Brown stated that he was angry because he did not have a haircut and had not had access to the law library. (*Id.*) He placed the strip of fabric around his neck and refused to give the strip of fabric to jail staff. (*Id.*) At 3:10 p.m., Mayweather-Brown reported that he had cut himself with glass. (*Id.* at 728.) A nurse arrived and cleaned and bandaged two to three of his superficial abrasions on his inner left wrist. (*Id.*) He would not surrender the piece of glass he used to harm himself. (*Id.*)

On August 14, 2014, Mayweather-Brown ripped off the top of his uniform and stated he was going to hang himself. (ECF 212-3 at 736.) He was upset because he did not get his allotted time in the law library that day. (*Id.*) He was later placed on level-three suicide watch. (*Id.*)

About two weeks later, on September 1, 2015, Mayweather-Brown assaulted a jail officer by knocking him to the ground and gaining control of his taser. (ECF 212-3 at 776-77.) After he was returned to his cell, he began belligerently kicking and pounding on the door of his cell. (*Id.*) On September 15, 2015, he told jail officers that he was going

to hang himself because he wanted to be out of his cell more often and at different times of the day. (*Id*. at 802.)

On October 8, 2015, after being given his evening medication, Mayweather-Brown walked to the back of his cell, threatened a jail officer, and stated "[c]ome get them, I'm not taking them." (ECF 212-3 at 865.) Several days later, he hit his head on his bunk. (*Id*. at 878-79.) In late October, Mayweather-Brown was observed holding a piece of torn cloth in his hands and announced that he intended to kill himself. (*Id*. at 895.) Later that day, he stated he was busy trying to hang himself. (*Id*. at 899.) He covered the window and camera in his cell. (*Id*.)

On October 28, 2015, in mid-afternoon, Mayweather-Brown was able to break out of the restraint chair multiple times. (ECF 212-3 at 905, 914, 919.) He had also made two superficial cuts to his inner left wrist, was verbally threatening, and declined medical attention. (*Id*. at 920.) Later that evening, Mayweather-Brown tied a rag around his arm to make the veins pop out and made a cut to his wrist with a paper clip. (*Id*. at 917.)

Next, on October 29, 2015, at 2:30 p.m., Mayweather-Brown was attempting to hurt his wrist using the sink. (ECF 212-3 at 903.) He refused medical treatment for the wound on his left wrist, stating "I'm gonna call you when it's bad enough." (*Id*. at 925.) At 2:45 p.m., Mayweather-Brown told the medical staff that he was bleeding, and the nurse observed a small, superficial laceration to his inner left wrist. (*Id*. at 903.) He was then placed on suicide watch. (*Id*. at 927-928, 930.)

On October 30, 2015, Dr. Mathew met with Mayweather-Brown due to his escalating behavior. (ECF 212-3 at 934-36.) Because he had more restrictions, his threats

of suicide and self- harm had escalated. (*Id.* at 934.) Mayweather-Brown had also been placed in the restraint chair a few times, but he had chewed his way out. (*Id.*)

On October 31, 2015, at 1:00 p.m., Mayweather-Brown attempted to hang himself on the bar next to his toilet. (ECF 212-3 at 948.) Jail officers discovered him and tore away the cloth that he had tied around his neck. (*Id.*) His belongings and clothing were confiscated for his safety, which caused him to become irate. (*Id.*) At 4:20 p.m., he was placed in the restraint chair after making numerous attempts at hurting himself. (*Id.* at 944, 946, 953.) Mayweather-Brown stated he intended to stay in the restraint chair for several days. (*Id.* at 953.)

On November 2, 2015, at 9:00 a.m., jail officers contacted the nursing staff and reported that Mayweather-Brown had eaten a tube of tooth paste because "it was the right thing to do." (ECF 212-3 at 975.) At 9:24 a.m., a nurse observed him in his cell eating another tube of toothpaste. (*Id.* at 978.)

The next day, on November 3, 2015, Mayweather-Brown made a superficial cut to his wrist with a small piece of plastic. (ECF 212-3 at 993.) The nurse observed the cut to be superficial and only slightly bleeding. (*Id.*)

On January 4, 2016, Mayweather-Brown was involved in a physical altercation with jail officers during which he scratched and spit at them. (ECF 212-3 at 1128, 1130.) After the altercation, he made suicidal statements. (*Id.* at 1128.) Several weeks later, on January 21, 2016, Mayweather-Brown was transferred to an IDOC facility. (ECF 212-2 at ¶ 5.)

STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In ruling on a motion for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. The court will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's sole task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material

dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable fact finder could find in favor of the nonmoving party, summary judgment may not be granted. *Id.* Nevertheless, a party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

ANALYSIS

The Defendants move for summary judgment asserting they are entitled to judgment as a matter of law because there are no genuine issues of material fact as to Mayweather-Brown's Fourteenth Amendment conditions of confinement claim. (ECF 306, 314.) In this regard, the Defendants argue that the undisputed evidence in this case establishes that they took reasonable steps to prevent Mayweather-Brown from harming himself and others by removing his clothing and bedding when he either made suicidal threats or engaged in actual suicidal acts. (ECF 307, 315.) They explain that these items were only confiscated when he was using them for these purposes and Mayweather-Brown was provided with a suicide blanket during non-sleeping hours, and his mattress and blanket were only removed during non-sleeping hours. (*Id.*) Furthermore, Mayweather-Brown never complained to any of the Defendants about the temperature in his cell being too cold. (*Id.*)

In opposing summary judgment, Mayweather-Brown asserts that the Defendants failed to provide him with appropriate conditions of confinement, including adequate

clothing, bedding, and heat in violation of his Fourteenth Amendment rights. (ECF 352 at 1-2.) In this regard, he states that the Defendants deprived him of a mattress for up to 16 to 18 hours a day and he was deprived of a mattress for weeks and months at a time. (*Id*. at 1.) Mayweather-Brown further claims that the Defendants deprived him of clothing and bedding in a cell that was not suitable to house a naked detainee who stood, sat, and laid down on a concrete floor and metal bed for hours, days, and even weeks. (*Id*.) Thus, according to Mayweather-Brown, he is not challenging his conditions of confinement with respect to his mental health status or "psychiatric state of mind" but rather the Defendants' "deprivation of [his] civilized measures of life's necessities" which constitute a "form of punishment for [his] behaviors that custody deemed unacceptable." (*Id*.)

As a pretrial detainee, Mayweather-Brown's constitutional rights are derived from the Fourteenth Amendment's Due Process Clause. *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015). "[T]he Fourteenth Amendment's Due Process Clause prohibits holding pretrial detainees in conditions that 'amount to punishment.'" *Id*. (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). "A pretrial condition can amount to punishment in two ways: first, if it is 'imposed for the purpose of punishment,' or second, if the condition 'is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment.'" *Id*. (quoting *Bell*, 441 U.S. at 538–39). A pretrial detainee states a valid Fourteenth Amendment claim by alleging that (1) the defendants "acted purposefully, knowingly, or perhaps even recklessly," and (2) the defendants' conduct was

objectively unreasonable. *Miranda v. Cty. of Lake*, 900 F.3d 335, 353–54 (7th Cir. 2018)

(citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-74 (2015); *see also Hardeman v.*

*Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (extending *Kingsley's* objective inquiry to all

Fourteenth Amendment conditions-of-confinement claims brought by pretrial

detainees).

### Stephanie Bigler and John Perry

Turning to the merits of the case, the record establishes that the actions taken by

Defendants Bigler and Perry to protect Mayweather-Brown from committing suicide

and engaging in acts of self-harm were objectively reasonable and related to a legitimate

non-punitive governmental purpose. *Hardeman*, 933 F.3d at 822. (reasonable actions are

rationally related to a legitimate non-punitive governmental purpose and are not

excessive in relation to that purpose.) As courts have recognized, conditions of

confinement cannot be analyzed in a vacuum; rather conditions of confinement must be

analyzed in regard to the inmate's own behavior. As stated by the court in *Bowers v.*

*Pollard*, 602 F. Supp. 2d 977 (E.D. Wis. 2009):

> [W]hen a prison is facing a recalcitrant and uncontrollable inmate, it has a
> freer hand to take steps to impose discipline and ensure the inmate's own
> safety without running afoul of the Eighth Amendment. What may be
> considered cruel and unusual in one case may be acceptable in another, so
> long as the conditions imposed have some legitimate coercive and
> penological purpose and are linked to correcting the behavior in question.

*Id*. at 989. While this case is governed by the Fourteenth Amendment, the same

principles apply.

In this case it is undisputed that Mayweather-Brown was an uncontrollable inmate—his anger and actions were unmanageable. (ECF 299 at 10, 212-3 at 171). He regularly engaged in incidents involving suicide threats, attempted self-harm, threats directed towards jail and medical staff, aggressive physical behavior towards jail and medical staff, assaults on jail staff, and destruction of property. (ECF 299 at 4-54, 316 at 8-17.) However, the jail and medical staff had to manage Mayweather-Brown's behavior while they were attempting to treat him. They had a duty to protect him from himself and to take reasonable steps to ensure that he did not harm others. The record shows that this was a difficult task. In fact, Yoder, one of Mayweather-Brown's health care workers at the Elkhart Jail stated that Mayweather-Brown "had been one of the most difficult inmates to treat." (ECF 299 at 68, ECF 212-7 at ¶ 59). Dr. Mathew assessed him as having extreme attention-seeking behavior, manipulating others by threatening self-harm, and having uncontrollable behavior. (ECF 299 at 28.) Others assessed him as being narcissistic, anti-social, and someone who made everyone miserable if he did not get what he wanted. (*Id*. at 23.) In addition, a local psychiatric hospital refused to admit Mayweather-Brown because the hospital was not equipped to manage his violent behavior. (ECF 299 at 6, ECF 212-7 at ¶ 6.)

While Mayweather-Brown argues that he was denied constitutionally adequate conditions of confinement, including adequate clothing, bedding, and heat as a form of punishment, he has produced no evidence that Bigler and Perry were motivated by a desire to punish him, and he fails to acknowledge the rationale for why he was denied these items. These items were confiscated from him to manage his violent behavior. The

record demonstrates that the actions of Bigler and Perry concerning Mayweather-Brown's bedding and clothing were not conducted separate and apart from the actions taken by the medical staff to manage his behavior and treat him. Rather, the actions of Bigler and Perry concerning his bedding and clothing were done in conjunction with the medical staff to implement decisions made by healthcare professionals. Thus, there is a reasonable connection between Mayweather-Brown's conduct and the response to his conduct by Bigler and Perry because the conditions of confinement relative to his bedding and clothing were put in place solely to prevent him from self-harming. (ECF 316-1 at ¶ 13.)

Although an Eighth Amendment case, *Gillis v. Litscher*, 468 F. 3d 488 (7th Cir. 2006) is instructive. In *Gillis,* an inmate who committed a minor rule infraction by not sleeping with his head toward the front of the cell was placed on a Behavioral Modification Program ("BMP"). As a result of being placed on the BMP, the inmate was deprived of clothing, bedding, human contact, and even toilet paper. The court decided that summary judgment for the defendants on the Eighth Amendment claim was not proper. Significantly, there was no evidence that the BMP was anything but a form of punishment for the rule infraction. In this regard the court opined:

> The BMP is . . . not simply a natural consequence "automatically" growing out of a rule infraction. It is much more elaborate. An inmate who refuses to put on his trousers can correct his situation immediately by putting them on. In contrast, defendants did not simply take Gillis's blanket away until he conformed with the rule. Once he received notice that he was to be put in the BMP, he had to complete the whole program; he couldn't make it stop.

*Id.* at 494-95.

However, this case is different from the *Gillis* case. Bigler and Perry along with the medical staff did not simply place Mayweather-Brown on a strict regimen for a set period of time because of a minor rule infraction. Rather, as discussed, the record before the court demonstrates that Bigler and Perry, working in conjunction with the medical staff, continually tried different strategies to manage Mayweather-Brown's behavior and to prevent him from harming himself and others.

Bigler and Perry also worked to find a way to provide clothing and bedding to Mayweather-Brown. The record indicates that Bigler and Perry as well as the medical staff made every attempt to allow him to have the same items issued to other inmates. However, Mayweather-Brown made numerous attempts to use his bedding and clothing to harm himself. (ECF 299 at 66.) In fact, "Mayweather-Brown would use any item, including suicide smocks, suicide blankets, mattresses, and even paint chips to threaten to harm himself in order to provoke a response." (*Id.*) Dr. Mathew, in conjunction with other doctors treating Mayweather-Brown, agreed that his treatment plan would include taking items out of his cell since he used anything that he could find to harm himself. (ECF 299 at 50, 212-3 at 1003.) His treatment plan was designed to keep him safe, manage his volatile behavior, and minimize his chances of seriously hurting himself or others. (ECF 299 at 65.)

During the relevant time period, the record shows that Mayweather-Brown was housed in different places at the Elkhart Jail in an effort to find a place where he could stay and not harm himself or others. For large periods of time, he was on suicide watch and housed in either the medical unit or the booking ward. (ECF 316-1 at ¶ 8.) When he

was on suicide watch, he would regularly tear up his suicide smock, suicide blanket, and mattress. (*Id.* at ¶ 9.) He also tore the padding off the cell's walls and floor. (*Id.*) When he was not on suicide watch, he was housed in the general population cells and given the standard prison uniform and bedding. (*Id.* at ¶ 10.) On more than one occasion when Mayweather-Brown was in a regular cell, he would tear wires out of the wall and remove paint chips from the wall in an attempt to retrieve items to self-harm. (*Id.* at ¶ 11.)

Furthermore, when Mayweather-Brown was on suicide watch, consistent with suicide watch procedures, his mattress and blanket were removed from his cell during non-sleeping hours. (ECF 212-1 at ¶ 13, 212-1 at 9, 212-2 at ¶ 8.) A mattress and blanket were always returned to Mayweather-Brown's cell during sleeping hours.[4] (ECF 212-1 at ¶ 13, 212-1 at 9, 212-2 at ¶ 8, 212-4 at 11-12, 316-1 at ¶ 12.) Furthermore, contrary to his contention, neither Bigler nor Perry ever issued an order to deny Mayweather-Brown "a mattress for 18 hours a day." (ECF 212-1 at ¶ 13, 212-1 at 9, 212-2 at ¶ 8, 212-4 at 26.)

Because Mayweather-Brown attempted to damage every cell in which he was placed, a special cell was prepared for him in booking with added protections in an attempt to prevent him from self-harming. (ECF 316-1 at ¶ 12.) This special cell did not have padding on the walls or floors because Mayweather-Brown had damaged the

---

[4] On March 20, 2014, when Mayweather-Brown entered Elkhart Jail, a video recording was made to document that he had a suicide blanket as well as the type of mattress he was given to use during sleeping hours. (ECF 316-1 at ¶ 15.)

padding and wood floors under the padding in the cells in which he was previously housed. (*Id*.) Special plating was also placed on the walls to prevent him from tearing out the wiring and removing paint chips. (*Id*.) Whenever Mayweather-Brown was on suicide watch and held in a cell that did not have padding on the floor, he was given a suicide blanket and a mattress during sleeping hours. (*Id*.)

The Court of Appeals for the Seventh Circuit's opinion in *Bowers v. Pollard,* 345 Fed. Appx. 191 (7th Cir. 2009) is instructive here. David Bowers sued the Green Bay Correctional Institution claiming that his conditions of confinement violated his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process. *Id.* at 193. After a history of self-harming behavior at another institution, Bowers was transferred to Green Bay and placed on observation status. *Id.* Bowers was loud and defiant claiming that the staff would have to "deal with" him. *Id.* Bowers was released from observation and placed on a behavioral action plan ("BAP"). *Id.*

Under the BAP, Bowers's property and privileges were restricted. 345 Fed. Appx. at 193. Bowers was given bagged meals and a "seg-smock." *Id*. He was a recalcitrant and manipulative inmate, promising to inflict self-harm in the future if not given the property he demanded. *Id*. at 194. Bowers repeatedly inserted random objects into his penis, including toenail clippings, orange peels, bits of his mattress, cardboard from milk cartons, a ball-point-pen insert, a bandage, and pieces of metal from a dismantled sprinkler head. *Id*. He also banged his head against the cell wall. *Id*. Bowers' BAP was

reevaluated at least 21 times over an eight-month period. *Id*. His property and

privileges were restored although usually only temporarily. *Id*.

The Seventh Circuit found that there was no evidence that any of the conditions

of the BAP, such as the denial of a mattress in response to Bowers's attempts to use it

for self-harm, posed an unusual hardship. 345 Fed. Appx. at 196. The court reasoned

that the restrictions imposed on Bowers were non-punitive and designed instead to

prevent him from harming himself or others. *Id*. at 196-97.

While this case is governed by the Fourteenth Amendment rather than the

Eighth Amendment, the principles of *Bowers* remain applicable. The restrictions placed

on Mayweather-Brown by Bigler and Perry were not punitive but were designed to

prevent Mayweather from harming himself and others. The undisputed facts

demonstrate that Bigler and Perry only took such action as they deemed necessary to

assist the medical staff in managing Mayweather-Brown's violent behavior. Here, there

is no evidence that Bigler and Perry arbitrarily deprived Mayweather-Brown of

necessary clothing and bedding.

To the extent Mayweather-Brown claims that he was subjected to constitutionally

inadequate conditions because his cell was cold, his contention is not supported by the

record. First, he never complained to Bigler or Perry about the temperature in his cell.

(ECF 212-1 at ¶ 14, 212-2 at ¶ 14, 316-1 at ¶ 14.) Secondly, his medical and jail records do

not indicate that he ever complained about cold conditions in his cell. Thirdly, jail

inspection records from 2013 through 2017 show that the temperature in the Elkhart Jail

ranged from 71 to 73.3 degrees Fahrenheit, clothing and bedding were adequate for the

prevailing temperature, and suitable clothing and bedding were provided to the inmates. (ECF 316-2 at ¶ 9.) Fourthly, Mayweather-Brown never filed a grievance complaining that he was cold and admitted that the temperature of his cell was "upper 60's, lower 70's." (ECF 212-4 at 59-61.) In fact, the only statement Mayweather-Brown made about the temperature in his cell was that it was too warm. (ECF 212-2 at 59.)

Given Bigler's and Perry's role in managing and monitoring Mayweather-Brown during his confinement at the Elkhart Jail, no reasonable fact finder could find that their actions were objectively unreasonable and not rationally related to a legitimate, non-punitive governmental objective. Therefore, they did not violate Mayweather-Brown's Fourteenth Amendment rights by withholding clothing and bedding during those periods when he engaged in acts of self-harm and acted violently toward medical and jail staff. Furthermore, there is no evidence that his cell temperature was anything other than adequate. Therefore, there is no evidence for the court to conclude that Bigler's and Perry's conduct was objectively unreasonable given the facts in this case.

### Gary Yoder

The record in this case further establishes that the actions taken by Defendant Yoder in managing and monitoring Mayweather-Brown's violent behavior were also objectively reasonable and related to a legitimate non-punitive governmental purpose. Yoder's role in confiscating Mayweather-Brown's blanket, mattress, and clothing was reasonable because these items were only taken from Mayweather-Brown when he used them to threaten suicide, or to commit self-harm. In other words, Yoder denied him

access to his blanket, mattress, and clothing only when it was necessary to prevent him from hurting himself.

The record in this case establishes that Yoder as well as medical and jail staff acted reasonably to ensure Mayweather-Brown's safety when he was combative and dangerous. For example, on March 24, 2014, after Mayweather-Brown was released from his restraint chair, his clothes were removed from his cell, and he was given a suicide smock and suicide blanket. (ECF 212-7 at ¶ 10.) On May 19, 2014, Mayweather-Brown's suicide smock was taken from him after he tore up the smock for use in self-harming behavior. (ECF 212-3 at 425.) He was also denied a blanket and was told that he would need to refrain from harming himself before he would be given a blanket. (*Id*.) On May 21, 2014, after Mayweather-Brown was observed holding pieces of a ripped blanket that he had tied together to use to attempt to hang himself, the blanket was removed from his cell to prevent him from self-harm. (*Id*. at 437.) On May 22, 2014, he was not allowed to have a mattress because he had used a number of items in his cell to attempt to harm himself. (ECF 212-7 at ¶ 21.) On August 10, 2015, Mayweather-Brown was observed sitting under a blanket with a piece of fabric from his mattress cover tied around his neck. (ECF 212-3 at 726.) On October 31, 2015, Mayweather-Brown's belongings and clothes were removed from his cell after he attempted to hang himself in his cell. (ECF 212-7 at ¶ 39.) However, despite Mayweather-Brown's multiple attempts at self-harm, his blanket, bedding, and mattress were returned to him when he no longer posed a threat to himself. (ECF 307-1 at ¶ 6.)

Furthermore, in his role as a licensed clinical social worker, Yoder was not responsible for controlling the physical conditions of the Elkhart Jail, including the temperature in the jail. (ECF 307-1 at ¶ 4.) Yoder never documented any complaints from Mayweather-Brown about being cold. (*Id*.) As discussed *supra*, Mayweather-Brown never filed a grievance complaining that he was cold and admitted that the temperature of his cell was "upper 60's, lower 70's." (ECF 212-4 at 59-61.) In fact, the only statement Mayweather-Brown made about the temperature in his cell was that if was too warm. (ECF 212-2 at 59.)

In sum, Yoder acted to prevent Mayweather-Brown from harming himself and frequently met with him, sometimes as often as every hour, to assist with his acute mental crises. His decision to remove his blanket, mattress, and clothing from his cell was not punishment but an effort to stop Mayweather-Brown from using these items to harm himself. Thus, this temporary deprivation of bedding, blankets, and clothing was the only way to ensure Mayweather-Brown's safety. Furthermore, as stated *supra*, there is no evidence to suggest that his cell temperature was anything other than adequate. Therefore, there is no evidence for the court to conclude that Yoder's conduct was objectively unreasonable given the facts in this case.

In conclusion, the Defendants' motions for summary judgment are granted as to Mayweather-Brown's claim that he was denied constitutionally adequate conditions of confinement, including adequate clothing, bedding, and heat while housed at the Elkhart Jail in violation of the Fourteenth Amendment.

Therefore, the court:

(1) DENIES Quintin J. Mayweather-Brown's "Motion to Exclude Relivent (sic) Evidence (on grounds of prejudice, confusion or waste of time) and Exclusion of Character Evidence" (ECF 359);

(2) GRANTS summary judgment in favor of Gary Yoder (ECF 306);

(3) GRANTS summary judgment in favor of Steffany Bigler and John Perry (ECF 314);

(4) DISMISSES the case with prejudice; and

(5) DIRECTS the clerk to close this case.

SO ORDERED on March 30, 2020

_____/s/JON E. DEGUILIO_____
JUDGE
UNITED STATES DISTRICT COURT